Triplex Shoe Company, a corporation organized and existing under the laws of the State of Delaware, L. E. Dillman, John A. Curtis, Harry Miller, L. T. Rider and Albert W. Dillman,

Respondents Below, Appellants,

*vs.*

Rice and Hutchins, Incorporated, a corporation organized and existing under the laws of the State of Maine, Petitioner Below, Appellee, and Harry L. Rice, Fred B. Rice, Frank D. Ellison and Philip Mulvihill,

Respondents Below, Appellees.

*Supreme Court, on Appeal, Feb. 27, 1930.*

PENNEWILL, C. J., and RICE, HARRINGTON, RICHARDS, and RODNEY, JJ., sitting.

*Marvel & Morford*, for appellants.

*Charles C. Keedy*. for appellee Rice & Hutchins, Inc.

*Robert H. Richards*, for appellees Harry L. Rice, Fred B. Rice, Frank D. Ellison, and Philip Mulvihill.

PENNEWILL, C. J., delivering the opinion of the court:

This case is an appeal from the decision, 16 *Del. Ch.* 298, 147 A. 317, of the Chancellor determining, under the provisions of *Section* 31 of the *General Corporation Law of the State (Revised Code* 1915, § 1945, as amended by 35 *Del. Laws, c.* 85, § 15), who were elected directors of the Triplex Shoe Company at the last annual meeting of the stockholders thereof held January 28, 1929. The proceeding below was on a stockholder's petition asking for the determination by the Chancellor of the validity or invalidity of such election.

It would be very difficult to state the facts in the case more clearly and fully than counsel have done in their respective briefs. But there is not entire agreement on certain facts alleged on the

one side and denied on the other. The disagreement does not seem to pertain to any facts that are material to the real issues in the case, but because of it the court will adopt, for the most part, the statement of facts called "Summary of the Case" prepared by the Chancellor and preceding his opinion. The correctness of such summary does not appear to be questioned by either side, and it is full enough to clearly present the issues upon which the case will be decided in this court. To state at length the alleged facts and the many contentions of counsel would not only cause unnecessary labor, but might confuse rather than clarify the real issues and the arguments made thereon.

The Triplex Shoe Company was incorporated December 13, 1919. Its certificate of incorporation provided that its total authorized capital stock should be one hundred and fifty thousand dollars, "divided into seven hundred and fifty preferred shares, of the par value of one hundred dollars ($100) each. And the remaining seventy-five thousand dollars in shares of common stock without any par value." What the preferred stock's preferences, if any, were, was not stated.

At the first meeting of the directors held on January 8, 1920, Albert W. Dillman was elected president, Elmer Solly, vice-president and secretary and Louis E. Dillman, treasurer. According to one set of minutes, these individuals composed the entire board of directors at that time. According to another set, two other persons, Messrs. M. J. Robinson and W. F. Emery had also been elected to the board. At the board meeting held on January 8, 1920, the following resolution was adopted by the directors:

"That in consideration of the services rendered in organizing the Company, and in agreeing to serve the Company at a much smaller compensation than they would otherwise, upon and in consideration of other services to be rendered in the premises and for actively managing the company, that Mr. Albert W. Dillman receive three hundred and seventy-six shares (376) of the common stock of the Company; that Mr. Louis E. Dillman receive one hundred and fourteen shares (114) of the common stock of the Company; and that Elmer Solly receive fifty shares (50) of the common stock of the Company, which shares shall be full paid and non-assessable and which shall include the original subscriptions to capital stock made by these three named persons."

The stock was issued in accordance with this resolution. Thereafter, Solly transferred his fifty shares to the two Dillmans, so that Albert W. Dillman's holdings of common then amounted to four hundred and one shares and Louis E. Dillman's to one hundred and thirty-nine shares.

At various times prior to February 28, 1921, other common shares to the number of one hundred and twenty-one were issued to various persons.

On February 28, 1921, at a special meeting of stockholders, a resolution authorizing an amendment to the certificate of incorporation was adopted, but not filed in the office of the Secretary of State until nearly a year later, viz., January 20, 1922. The certificate filed with the Secretary of State certifies that all of the outstanding common and preferred shares voted for the amendment. The amendment contained the following provisions as to capital as a substitute for the original:

"The total authorized capital stock of this corporation consists of twenty-three hundred and seventy-five shares (2375) of preferred stock with a par value of one hundred dollars ($100.00) each, and amounting in the aggregate to two hundred and thirty-seven thousand five hundred ($237,500.00) and ten hundred seventy-five (1075) shares of common stock, which common shares shall be without nominal or par value."

(Then follows a description of the preferences which the preferred stock should be entitled to.)

"The sole voting power shall reside in the holders of the common stock."

On April 5, 1921, Rice and Hutchins, Incorporated, the petitioner below, purchased two hundred and forty-nine shares of preferred stock, paying therefor in merchandise, and was given eighty-three shares of common stock as a bonus on the basis of one share of common for three shares of preferred.

According to one set of minutes, though not according to another, the stockholders at their annual meeting held January 24, 1922, unanimously adopted the following resolution:

"Whereas, on January 8, 1920, the Board of Directors voted to pay for services rendered the following number of shares of common stock of the company to the gentlemen named:

"Albert W. Dillman 376 shares.
"L. E. Dillman 114 shares.
"Elmer Solly 50 shares.

"And whereas, question has arisen as to the validity of this stock by reason of the imperfections in the original Certificate of Amendment,
"Now, therefore, be it

"Resolved, That the corporation approve the action of the Board of Directors as passed at that meeting and instruct the officers of the company to issue valid certificates for a like amount of stock to the gentlemen named in place of the stock certificates executed to them at that time."

The petitioner gave a proxy to the Dillmans to vote its eighty-three shares of common stock at this meeting. The said shares were voted in favor of the resolution.

On April 1, 1922, the petitioner purchased two hundred and fifty shares of preferred, receiving with it fifty shares of common as a bonus.

The petitioner then held, as will be seen, four hundred and ninety-nine shares of preferred and one hundred and thirty-three shares of common. Its certificates were in the form originally used by the company before the amendment authorized by the meeting of February 28, 1921, was adopted.

Thereafter all outstanding certificates were called in and new certificates gotten up in a form adapted to the amended charter, issued in lieu thereof. This was later than April 24, 1922. The petitioner surrendered its old certificates and accepted the new ones for its common and preferred stock.

On May 20, 1922, the certificate of incorporation was again amended, altering to some extent the features of the preferred stock, but leaving practically undisturbed the existing provisions as to the common.

On May 15, 1922, the petitioner purchased four hundred shares of preferred, receiving also as bonus eighty shares of common; and on January 1, 1925, the petitioner purchased two hundred and fifty shares of preferred, receiving also a bonus of fifty shares of common.

This was the last acquisition of stock by the petitioner. Its present holdings, therefore, are eleven hundred and forty-nine shares of preferred stock and two hundred and sixty-three shares of common.

The petitioner gave proxies for voting its common stock at all meetings of the stockholders down to the meeting of January, 1929. One of its directors was also elected to the board of the respondent as its representative in 1925 and continued to act as a director of the respondent as long, at least, as 1928.

The 1929 annual meeting of the stockholders was held on January 28th. At that meeting, a contest developed over the election of directors. Two tickets were presented, one designated as the "A" ticket, supported by the petitioner, and the other as the "B" ticket, supported by the Dillman faction. The "B" ticket was declared to have been elected.

Notwithstanding the voluminous briefs filed in the case, and the elaborate arguments and numerous contentions made by counsel, the court think the case, so far as the real issues are concerned, lies within a narrow compass. The important question is, was there any common stock voted for the "B" ticket at the election in 1929 that was legally issued and outstanding at that time? It is admitted by the appellees that if there was any such stock the preferred stock could not be voted because the sole voting power resided in the holders of the common stock, and the "B" ticket was, therefore, properly declared elected.

It is admitted by the appellants that the preferred par value stock was valid stock and outstanding at the time of the election, but denied that it was entitled to vote for a reason considered in the court's opinion.

The Chancellor decided that there was no valid common stock outstanding at the time of the election that had a right to vote, and that the preferred stock was legally voted.

To determine the correctness of the Chancellor's decision three questions must be considered, viz.:

1. Was there any common stock legally issued by the corporation under its original certificate of incorporation?

2. Did the amendment to the certificate of incorporation which was authorized February 28, 1921, validate the no par value stock that was issued under the original certificate of incorporation?

3. Was there any such stock legally issued after the amendment?

The original certificate provided that

"Fourth: The amount of the total authorized capital stock of this corporation is One Hundred and Fifty Thousand Dollars ($150,000.00) divided into seven hundred and fifty preferred shares of the par value of One Hundred Dollars ($100.00) each. And the remaining seventy-five thousand dollars in shares of common stock without any par value.

"The amount of capital stock with which this corporation will commence business is five thousand dollars ($5,000.00)."

It will be observed that in the original certificate of incorporation two classes of stock were created, a preferred with par value, and a common with no par value. The preferred, however, was such only in name, no preference being stated, as required by law.

It is claimed by the appellee that the language in the charter providing that the remaining $75,000 (of capital) in shares of common stock without par value, is inoperative as a grant of authority for the issue of such shares, in that it is in direct violation of *Section* 5 of *Paragraph* 4 of the *Delaware Corporation Law* (*Revised Code* 1915, § 1919, *par.* 4, as amended by 35 *Del. Laws, c.* 85, § 4), which provides that with respect to no par value stock, the certificate shall state the total number of shares authorized, that they are without nominal or par value, and the number of shares with which it will commence business, which shall not be less than ten shares.

This was the law at the time the original certificate of incorporation was granted and we can see no answer to the contention that the language of the certificate respecting the shares of common stock without par value was unauthorized by law, and therefore, inoperative. Certainly no authority or argument is needed to support the proposition that the authority of a corporation to issue stock is fixed by the law of the State which grants the authority, and neither the incorporators or any other officers can change, modify or supplement the law in that regard. The provision, therefore, in the certificate of incorporation that a certain part of the capital of the incorporation is in shares of common stock without any par value, without stating the number of shares is not only unauthorized by any law of the State, and inoperative, but it is also meaningless in view of the law.

Such being the case, we can see no escape from holding that the no par value stock attempted to be issued under the original certificate of incorporation was invalid stock.

Manifestly the appellants appreciate the difficulty of maintaining the validity of such stock issue and seek to show that even if it was illegally issued, it had a right to vote because it was *de facto* stock.

As to this point we think that if there is such stock as *de facto* stock, recognized by the law in any case, there could not be and has not been, in a case where the charter provision respecting the issuance of no par stock was wholly unauthorized by the law of the State which granted the charter, and where there has not been a compliance with the law under which the corporation was organized. If there was no authority at all for the issuance of the stock, certainly its purported or attempted issue could not impress upon it the character of any kind of stock that the law would recognize. It may be that appellants think there can be *de facto* stock because the law recognizes, under some circumstances, *de facto* corporations. But being clear that there was no *de facto* stock in the present case it would be unprofitable to state at length the reasons for the recognition of *de facto* corporations, and the persons who can invoke the doctrine. The principle underlying the rule is largely one of estoppel. As was said in the case of *Duggan v. Colo. Mortgage & Investment Co.*, 11 *Colo.* 113, 17 *P.* 105:

"The rule is in the interest of the public, and is essential to the safety of business transactions with corporations."

It is sufficient to say in the instant case with respect to the subject we are discussing, that the principle that the validity of the issue of stock is to be determined solely by the law of the State under which the corporation is organized, and the provisions of the charter is so clear as to require no citation of authorities to support it.

There is a very good reason for requiring a Delaware corporation to specify in its charter the number of no par value shares it is authorized to issue. The franchise tax law (*Revised Code* 1915, §§ 102–122, as amended 35 *Del. Laws, cc.* 6 and 7) calculates

the tax due from corporations which are authorized to issue no par value shares, at a certain rate upon each share of stock which the corporation is authorized in its charter to issue. This is a sufficient reason for holding that the doctrine of *de facto* stock, if any there be, could not apply to this case where the charter is silent or meaningless in its reference to the number of such shares the corporation was authorized to issue.

The appellants contend very vigorously and apparently with much confidence, that the common stock issued to the Dillmans and Solly, even though it was issued illegally, was not void, but voidable, and therefore entitled to vote. In support of this contention reliance is placed on the case of *Cooney Co. v. Arlington Hotel Co.*, 11 *Del. Ch.* 430, 106 *A.* 39, 44; *Finch, et al., v. Warrior Cement Corp.*, 16 *Del. Ch.* 44, 141 *A.* 54; *Scully, et al., v. Automobile Finance Co., et al.*, 12 *Del. Ch.* 174, 109 *A.* 49, and other cases.

It is true that in those cases it was held that stock might be issued contrary to law and not be void, but voidable, but there is a clear distinction between such cases and the instant one. They are distinguishable on two grounds:

First, in two of those cases it was sought to assess the stock for the benefit of creditors of the corporation that had become insolvent, and not to enforce a right claimed by stockholders who had not paid for their stock. It was held that the stockholder could not escape his liability to creditors by claiming that his stock, which he had accepted but not paid for, was void. It was voidable only as to him and he would not be permitted to say it was void and not liable to assessment.

In the *Arlington Hotel Company Case*, the court said:

"The law means, and practically says: Corporate stock shall not be issued without valid consideration, but if it is so issued, contrary to law, the acceptor will be bound to pay its par value if the debts of the company cannot be paid otherwise. * * *

"Although the Constitution of this state provides that 'no corporation shall issue stock, except for money paid, labor done, or personal property,' etc. * * * it cannot be that directors who have issued bonus stock to themselves, or acquiesced in its issue, with full knowledge of all the circumstances, can escape the liability the law imposes by claiming that their stock was

issued in violation of law. Persons who accept stock issued in violation of law, of which they had knowledge, cannot escape the liability incident to the relation of stockholders which they have with full knowledge assumed.

"And even though stock issued without consideration could be held to be void under our constitutional provision, and could be canceled by the corporation or upon the application of *bona fide* stockholders, it does not follow that the acceptor of such stock could claim immunity from assessment. Certainly a stockholder cannot escape such assessment if he has held himself out, or permitted himself to be held out, as the owner of the stock; and much less could he escape if he participated in the unlawful issue or acquiesced therein."

In some other Delaware cases, the Chancellor directed the cancellation of stock which had been issued without consideration.

In *Ellis v. Penn Beef Co.*, 9 *Del. Ch.* 213, 80 *A.* 666, this was done, the Chancellor holding that shares of stock so issued were void, and that the question of illegality could be raised by other stockholders.

In the case of *Scully, et al., v. Automobile Finance Co., et al.*, 12 *Del. Ch.* 174, 109 *A.* 49, 52, a solvent corporation, certain stockholders sought to have the stock of other stockholders cancelled on the ground that the issuance of said shares was void, no adequate consideration having been given therefor.

In this case, the Chancellor, after quoting from the *Arlington Hotel Company Case* the language above given, said:

"This means that the subscription is enforcible; that the part which contemplates the issuance of shares of stock for nothing is void; and that the subscription stands as though the bonus feature had been omitted. The distinction drawn is between declaring the issue of stock to be void and declaring that the contract to issue stock without statutory consideration is unlawful and void, the latter leaving unimpaired the obligation to pay for the stock when and as required by the corporation, or when needed to pay creditors. It is true this decision was made in a case where the corporation was insolvent, but the principle there adopted is equally applicable to all cases and to a case where the corporation is a solvent, going, prosperous concern. A court of equity may declare the unlawful subscription contract to be ineffective to relieve the stockholders of the legal duty to pay the par value of the stock if the interests of the corporation so demand, or it be necessary to do so in order to pay creditors of the company, or if for any reason it be equitable and just to do so.

"There are cases elsewhere, especially in New York, which hold otherwise, and in some states, such as Wisconsin, shares of stock issued contrary to the statute are declared to be void."

While it is unnecessary for this court to decide whether the principle adopted in the *Arlington Hotel Company Case,* where the company was insolvent, is equally applicable to all cases and to a case where the corporation is solvent, yet we may call attention to the fact that in two later Delaware cases, viz.: *Lofland v. Cahall,* 13 *Del. Ch.* 384, 118 *A.* 1, and *Sohland v. Baker,* 15 *Del. Ch.* 431, 141 *A.* 277, 58 *A. L. R.* 693, the Supreme Court approved the cancellation of stock of solvent corporations that had been issued for an improper consideration.

In the *Scully Case* a distinction was recognized between declaring the issue of stock to be void and declaring that the contract to issue stock without statutory consideration is void. In that case, as in the *Arlington Hotel Company Case,* in the *Sohland Case,* and others, the company had the corporate power to issue the stock, the court holding that the only act that was unlawful was its issuance for an inadequate consideration.

This brings us to the second ground upon which the cases relied on by the appellants, in this connection, may be distinguished from the present one, viz.:

That in the case now before the court the corporation had no power or authority from the State to issue the stock in question. We have seen no case in which it was held that stock issued contrary to law might be regarded as valid outstanding stock when there was no grant from the State to issue the kind of stock that was issued. Such stock, when attempted to be issued, must be treated as void, and is a nullity.

The appellants say, that even though the no par value stock that was issued under the original certificate of incorporation was invalid, the incorporators subscribed for common stock in the certificate of incorporation, as they had a right to do, and that, therefore, they were legal holders of such stock and had a right to vote it at the election in question.

The obvious answer to this contention is, that the incorporators did not actually subscribe to any number of shares in said certificate.

It is reasonable to believe that the appellants knew that all the no par value stock attempted to be issued under the original certificate of incorporation was invalid because the stockholders

at a meeting held on February 28, 1921, authorized an amendment to the certificate, and manifestly one reason for the amendment was to validate the stock that had been issued without corporate authority.

At a stockholders' meeting held February 28, 1921, the certificate was authorized to be amended. The no par value stock that had been theretofore issued under the original certificate was voted at that meeting in favor of the amendment. Even if the no par value stock had no right to vote because it was invalid stock, the stock described in the certificate as "preferred" was, according to the record, also voted in favor of the amendment. We will assume then, that the amendment was legally adopted by the vote of the "preferred" stock which was the only valid stock then outstanding. The material parts of this amendment we have stated. The amendment was not filed with the Secretary of State for almost a year after it was authorized at the stockholders' meeting, and in the interval, more stock, both original preferred and common was issued. The petitioner acquired its original stock both preferred and common during this interval, its certificates being in the old form. After the amendment was filed all outstanding stock certificates were called in for exchange. All the stockholders turned in their old certificates and received new ones for the number of shares, common and preferred, which they had theretofore held, the new certificates containing on their face a statement of the relative rights belonging to the two classes as defined in the amendment.

We are unable to see how the amendment could have made stock valid that was void because issued without any authority from the State. Such an amendment might cure certain irregularities, imperfections and defects in a stock issue that is authorized by the charter and laws of the State, but it does not seem to us that it can possibly relate back and validate a stock that was issued without any corporate authority. If the stock issue was void, a nullity, there was nothing to validate, nothing upon which the amendment could operate.

The resolution of amendment that is claimed to have validated the common, or no par value stock, which was issued under the original certificate recited "that a question had arisen

as to the validity of the stock by reason of the imperfections in the original certificate of incorporation." The law on this subject was carefully and fully considered in the following cases: *Scovill v. Thayer*, 105 *U. S.* 143, 26 *L. Ed.* 968; *Heide v. Capital Sec. Co.*, 200 *Ala.* 397, 76 *So.* 313; *Bick v. Seal*, 45 *Mo. App.* 475; *Ross-Meehan, etc., v. Southern, etc., Iron Co. (C. C.)* 72 *F.* 957; *Reilly v. Clyne*, 27 *Ariz.* 432, 234 *P.* 35, 39, 40 *A. L. R.* 1005; *McLain v. Oklahoma, etc., Ass'n*, 125 *Okl.* 264, 258 *P.* 272; *Trapp v. R. R. Men's Ref. Co.*, 114 *Kan.* 618, 220 *P.* 249; *American Tube-Works v. Boston, etc., Co.*, 139 *Mass.* 5, 29 *N. E.* 63; *Humboldt Driv. Park Ass'n v. Stevens*, 34 *Neb.* 528, 52 *N. W.* 568, 33 *Am. St. Rep.* 654; *Page on Contracts, vol.* 2, *par.* 1038, *page* 1832; *Fletcher, Cyclopedia of Corporations, vol.* 5, *page* 5774; *Thompson on Corporations, vol.* 3, § 2108.

Those cases recognize the distinction between the ratification of void and voidable acts, and the ineffectiveness of a curing or validating statute to give validity to a prior act which was void and not merely voidable. The law is well stated in *Fletcher Cyc. Corp., vol.* 5, *par.* 3468, *p.* 5765, as follows:

"Stock issued without authority and in violation of law is void, and confers no rights on the person to whom it is issued and subjects him to no liabilities. A contract to issue stock in violation of the provisions of the constitution or of the statute will not be enforced by the courts, nor can damages be recovered for its breach. A person may rescind his contract to subscribe for or purchase such stock and recover back what he has paid for it, upon a tender back or surrender of the certificate, and of any dividends which he has received; or he may set up the illegality of the stock as a defense to an action by the corporation on his subscription. And since such a contract is illegal and void, it is incapable of ratification. If there is an inherent lack of power in the corporation to issue the stock, neither the corporation nor the person to whom it is issued is estopped to question its validity."

The cases relied on by appellants to show the curative effect of an amendment to a charter are distinguishable, we think, either on the ground that in such cases the corporation had the power to issue the kind of stock that was issued, or on the ground of estoppel.

The following authorities cited by appellants hold that an unauthorized over-issue may afterwards be rendered valid by a duly authorized increase. 14 *C. J.* 404; *Thompson on Corpora-*

*tions*, 3561; *Cook on Corporations*, 292; *In re New Zealand Banking Corp.*, *L. R. 3 Ch.* 131, and *Murphy v. Braker*, 89 *Hun.* 387, 35 *N. Y. S.* 387.

But in the present case the corporation had no power to issue the kind of stock that was attempted to be issued; the act was void and not merely voidable, and under practically all the authorities, it is incapable of being cured or validated by an attempted ratification by amendment or other subsequent proceeding.

In our view of the case, there is good reason for holding that all the no par value stock that was issued both before and after the amendment was invalid because the consideration therefor was never fixed as required by law. The pertinent provisions of the *Delaware Corporation Law*, governing the issue of stock without par value, in force when the original certificate of incorporation was granted, and when the amendment was filed, were as follows:

*Section 4a.* "Such capital stock without nominal or par value, whether common or preferred, may be issued by the corporation from time to time for such consideration as may be fixed from time to time by the Board of Directors thereof pursuant to authority conferred in the certificate of incorporation or in any amendment thereof or if such certificate or amendment thereof shall not so provide, then by the consent of the holders of two-thirds of each class of stock then outstanding and entitled to vote given at a meeting called for that purpose in such manner as shall be prescribed by the by-laws, and any and all shares without nominal or par value so issued, full consideration for which has been paid or delivered, shall be deemed full paid stock and not liable to any further call or assessment thereon, and the holder of such shares shall not be liable for any further payments under the provisions of this chapter."

*Section 4a* (*Code*, § 1918*a*) found in *Chapter* 113, *Volume* 29, *Laws of Delaware*, is now *Section* 14, *Chapter* 135, *Volume* 36, *Laws of Delaware* (*Code*, § 1928).

The certificate of incorporation did not confer upon the board of directors authority to fix the consideration for no par value stock, and, therefore, the consideration could be fixed only by the stockholders as provided by the statute. The stockholders never fixed the consideration for any of the no par value stock issued by the corporation after its organization, and there is no

escape from the conclusion that all such stock was invalid at the time of the election in question and not entitled to be voted.

It is a wise provision of the law that the consideration which must be paid for no par value stock shall be fixed by proper authority, because persons who have become stockholders, and have furnished the capital of the corporation, should know what must be paid for the no par value stock that is to be issued. Certainly such stock cannot be regarded as valid and outstanding unless the consideration therefor was fixed as required by law.

But the appellants insist that even if all the other no par value stock was illegally issued there were certain shares voted for the "B" ticket that cannot be shown to have been illegally issued, because it does not appear when they were issued and there cannot be any presumption of illegality. True, it does not clearly appear when these shares were issued but they are subject to the same infirmity as other no par value shares in that they were issued either without corporate authority or the consideration therefor was at no time fixed by proper authority.

Having held that there was no valid common stock of the Triplex Shoe Company outstanding and entitled to vote at the annual stockholders' meeting in 1929, it may be unnecessary to determine whether there was any lawful consideration given for the 540 shares issued to the Dillmans and Solly at the first meeting of the board of directors on January 8, 1920. If, however, such shares were issued without lawful consideration it would be an additional reason for holding that they were invalid and not entitled to vote.

The consideration for such shares issued to the Dillmans and Solly, and mentioned in the resolution of the board authorizing the issuance was,

"Services rendered in organizing the company, and in agreeing to serve the company at a much smaller compensation than they would otherwise; upon and in consideration of other services to be rendered in the premises and for actively managing the company."

Clearly the consideration mentioned for the stock, consisting of services on the part of the persons to whom the stock was issued, was not such as the law of this State contemplates and requires. The services do not appear to be essentially different

or greater than the services ordinarily rendered in the promotion and organization of a corporation. But even if they were in part of a quality that might constitute proper consideration they consisted of services rendered and to be rendered. It is admitted by the appellants that services to be rendered in the future are not a lawful consideration for the issuance of stock, and it is not possible to tell from the evidence what proportion of the consideration was services to be rendered. It is fair to assume that the greater part of the consideration was of this character, because very little of it consisted of services actually rendered.

Under the pertinent decisions in this State, which we do not consider it necessary to cite, and much less discuss, we feel compelled to hold that no proper and lawful consideration was given for the common shares of stock issued to the Dillmans and Solly at the first meeting of the board.

But the appellants further contend that even if all the no par common stock issued by the corporation was invalid and not entitled to vote, the petitioner below was barred from maintaining its action by estoppel, ratification, acquiescence or laches because it has been a stockholder since April, 1921, and since that date has been present at all stockholders' meetings by proxy, has been represented on the board of directors since 1925, has uniformly voted its own no par stock, and has never objected to the voting of such stock by others until the annual meeting in 1929 when it sought to elect a board of its own. The position of the appellants seems to be, that the appellees have waived their right to now object to the validity of the no par value stock by not objecting to the validity of such stock, and its right to vote at preceding meetings.

As before remarked in this opinion, the present proceeding is based on *Section* 31 of the *General Corporation Law,* and is not one brought to determine the validity of stock except as it may be necessary in determining its right to vote.

Another fact of some significance and which differentiates this case from the cases cited by the appellants, is that the appellees did not participate in the illegal issuance of stock to the appellants under the original certificate of incorporation. Still another significant fact that may be noted in considering the

doctrine of estoppel or waiver is, that this case does not involve the legality of an election or corporate action in which the appellees participated and consented to the voting of invalid stock. On the contrary it involves the legality of an election at which the appellees objected to the voting of invalid stock. If, at the election in question the appellees had voted no par value common stock and consented to the appellants' voting such stock, it might be that it would not be permitted now to question its validity. But to say that they had waived their right to object at the meeting in 1929, because they had not objected at former meetings, we think is carrying the rule of waiver farther than the law permits and farther than any courts have gone. So far as the stockholders' meeting and election in question is concerned, the appellees voiced their objection timely, that is to say, before the election began. This is the only meeting and election with which we are now concerned, and it cannot be said that the appellees either waived their right to object to the voting of invalid stock at the election or were guilty of laches in asserting such right.

While appellants in their brief do not mention "waiver" as one of the grounds on which they rely, we assume that it is what they mean, rather than estoppel, because there is nothing in the former acts or conduct of the appellee to which the doctrine of estoppel could apply. The necessary elements of estoppel are very briefly, but clearly expressed in the case of *Shapera v. Fargo*, 240 *Ill. App.* 145, as follows:

"An estoppel *in pais* arises whenever one, by his conduct, affirmative or negative, intentionally or through culpable negligence induces another to believe and have confidence in certain material facts, and the latter, having the right to do so, relies and acts thereon, and is, as a reasonable and inevitable consequence, misled to his injury."

To this definition might be added, that the party to whom the false representation is made, or from whom the facts were concealed, must have been without knowledge of the real facts.

It is obvious from the record that the appellants had as much knowledge of the real facts as the appellee, and that they were not misled at all, and certainly not to their prejudice or injury

We express no opinion on other points made by the appellee against the application of estoppel or waiver. We base our opinion upon the ground that the appellee did not, by his failure to object at prior elections or meetings waive his right to object to the last meeting and election.

Having decided that all the no par value stock issued under the original certificate of incorporation was issued without corporate authority, and for that reason invalid, and having also decided that all no par value stock issued after the amendment to the charter, as well as that issued before, was invalid because no consideration therefor was fixed by proper authority, we are compelled to sustain the Chancellor in holding that the "A" ticket and not the "B" ticket was legally elected at the annual meeting of the stockholders in 1929, unless for some reason not yet considered, it is found that ticket "A" was not elected.

The appellees devote a considerable part of their reply brief to the discussion of points that do not appear to be controverted by the appellants, viz.:

First. Whether the Chancellor, in determining the right of stockholders to vote, under *Section* 31 of the *General Corporation Law*, may consider the invalidity of their stock, and

Second. If he has such power, must individual stockholders be made parties to the proceeding?

The appellants do not, in their briefs, deny that the Chancellor has such power, neither do they claim that individual stockholders must be made parties.

Said *Section* 31 provides that:

"Upon the application by any stockholder, the Chancellor shall have power to hear and determine the validity of any election of any director or officer of any corporation organized under this Chapter and the right of any person to hold such office, and in case any such office is claimed by more than one person may determine the person entitled thereto. * * *

"The Chancellor in any proceeding instituted under this *Section* shall have power to determine the right and power of persons claiming to own stock, to vote at any meeting of the stockholders authorized by or referred to in this Section."

*Section* 31 also provides who shall be made parties in a proceeding thereunder by directing that:

"In any such application service of copies of such petition upon the corporate resident agent of the corporation shall be deemed to be service upon the corporation and upon the person whose title to office is contested and upon the person, if any, claiming such office; and it shall be the duty of such resident agent to forward immediately a copy of said petition so delivered to him, or it, to the corporation and to the person whose title to office ·is contested and to the person, if any, claiming such office. * * *"

In view of such provisions, the appellants no doubt concluded that it would be useless to raise any question respecting the power of the Chancellor under said *Section* 31, or respecting the persons required to be made parties. They probably realized that the purpose of the section was to furnish a summary method of determining the validity of an election, and that such purpose was a wise and necessary one, because until the validity of an election for directors is determined, the business of the corporation is seriously affected.

But the appellants, while not denying the powers of the Chancellor, under said *Section* 31, do deny the correctness of his determination.

We think it is not doubted that the Chancellor would have the right, in an appropriate proceeding, to cancel shares of no par stock, because issued without corporate authority, because the consideration had not been fixed as required by law, or for any other reason proper and sufficient in law or in equity. By parity of reason it would seem, that under *Section* 31 of our *Corporation Law* the Chancellor could, for the same reasons, determine that any stock, the right of which was disputed, had not the right to vote.

We come now to the consideration of the reasons urged by the appellants against the recognition of the election of the "A" ticket. They say that even if the "B" ticket was not elected, it cannot be successfully claimed that the "A" ticket was elected.

1. It is argued that if the no par stock was invalid and not entitled to vote, the preferred stock which voted for the "A" ticket was not entitled to vote because the amended certificate of incorporation provided that "The sole voting power shall reside in the holders of the common stock."

It is claimed that such provision constituted a contract

between the corporation and all its stockholders, and the preferred stockholders were bound thereby.

We think the provision means, that if there is any common stock legally issued and outstanding, that is entitled to vote, the preferred stock cannot vote, but if there is no such common stock, the situation is the same as would be if no common stock had been issued at all.

The very necessities of the case would seem to compel the conclusion we have reached because a corporation would be unable to function if the particular class of stock that is given the sole right to vote has not been legally issued and cannot vote. Certainly the law does not contemplate such an unfortunate situation.

2. The appellants further claim that the election of the "A" ticket was illegal and ineffective because the persons named and voted thereon were not at the time stockholders of the corporation. While the *General Corporation Law* of the State does not require that a director shall be a stockholder, a by-law of the appellant company does.

We think the effect of such requirement is, that before a person, elected as a director can perform any duty as director, he must be a stockholder. He may be elected a director, but must qualify as such by becoming a stockholder before he can enter upon the duties of director. This question was distinctly passed upon by the Court of Chancery in the case of *Lippman v. Kehoe Stenograph Co.*, 11 *Del. Ch.* 412, 102 *A.* 988, 992.

In that case the Court said:

"The better and prevailing opinion on this question, in the absence of express statutory provision, is, that a director need not be a holder of any shares at the time of his election, but that it will be sufficient if he qualifies himself by becoming a holder of the requisite number of shares before he enters upon the office of director."

As was said in that case,

"Such qualification must be made within a reasonable time, and what would be a reasonable time, would depend upon the facts and circumstances of each case."

The record does not show when those elected as directors in the instant case became qualified, if at all, but the only question we must decide is whether they were eligible to be elected, not being stockholders at the time. We think they were.

The decree of the Chancellor will be affirmed.