George P. BAKER et al., Plaintiffs,

v.

PROVIDENCE AND WORCESTER COMPANY, a Delaware Corporation, Defendant.

Court of Chancery of Delaware, New Castle.

Submitted April 5, 1976.

Decided July 30, 1976.

Bruce M. Stargatt, Young, Conaway, Stargatt & Taylor, Wilmington, for plaintiffs.

Edmund N. Carpenter, II, Allen M. Terrell, Jr., Richards, Layton & Finger, Wilmington, for defendant.

QUILLEN, Chancellor:

Plaintiffs, court appointed trustees of the Penn Central Transportation Company, and stockholders of defendant Providence and Worcester Company (P & W), instituted this action attacking the validity of certain restrictive voting provisions in P & W's charter and seeking to enjoin the adoption of related amendments as well. Both parties have moved for summary judgment, acknowledging that there is no genuine issue as to any material fact. The trustees have also moved under Rule 23(c)(1) for an order determining that the suit shall be maintained as a class action. This is the decision on all motions.

Defendant P & W is a Delaware corporation. Its certificate of incorporation provides in Article Ninth:

"NINTH: Meetings of the stockholders may be held at such city, town or village within or without the State of Delaware as may be named in the By-Laws. The annual meeting shall be held at such time as required by the By-Laws; and at all meetings stockholders, holding or representing by proxy not less than twenty-five hundred shares, shall be necessary to constitute a quorum of the corporation, and each stockholder shall be entitled to one vote for every share of the common stock of said company owned by him not exceeding fifty shares, and one vote for every twenty shares more than fifty, owned by him; provided, that no stockholder shall be entitled to vote upon more than one fourth part of the whole number of shares issued and outstanding of the common stock of said company, unless as proxy for other members."

Plaintiffs, as trustees of Penn Central, own 9,551 or 28% of defendant's 35,000 outstanding shares, the largest single holder of P & W stock. There are 617 other

shareholders but the next largest holding is of less than 1,000 shares. The above provisions of the charter effectively restrict plaintiffs to only 485 votes or approximately 3% of the total voting powers. And, on July 6, 1972 amendments to the charter were approved by the shareholders over plaintiffs' negative votes which would increase P & W's stock twenty-fold to 1,400,000 no par value common shares and amend Article Ninth so that voting restrictions and quorum requirements would be retained in the same proportionate ratio after the re-capitalization as before it.

The voting restrictions challenged in this action have existed in the defendant's Certificate of Incorporation since incorporation in Delaware and in the legislative charters of its predecessor corporation which was dually incorporated in both the State of Rhode Island and the Commonwealth of Massachusetts since 1844. On July 31, 1969 P & W, a small railroad company operating a line between Worcester, Massachusetts and Providence, Rhode Island, was merged into a Delaware corporation which is the defendant herein.

The Penn Central Transportation Company (Penn Central) acquired its stock in P & W more or less involuntarily. In 1892 P & W leased its properties to the New York, New Haven and Hartford Railway (New Haven) for 99 years. During the early years of this century the New Haven acquired 9,551 shares of P & W stock. Subsequently, in 1962 the Pennsylvania Railroad filed with the ICC an application to merge with another railroad company, the New York Central Railroad. At that time the New Haven was in reorganization and the ICC required as a condition of approval of the desired merger between the Pennsylvania and the New York Central that the companies also take over the New Haven, including its lease with P & W and its P & W stock. The companies agreed and the new Penn Central thereby acquired most of the New Haven's assets, including the shares of P & W stock. The Penn Central went into

bankruptcy in 1970 and plaintiffs, as trustees of its property, acquired the P & W stock.

The purchase agreement made by the Pennsylvania and the New York Central, and the New Haven trustees, which agreement became a part of the New Haven reorganization plan, gave the Pennsylvania and the New York Central the power to instruct the New Haven trustees to disaffirm any New Haven lease which they did not wish to assume. Accordingly, the Pennsylvania Railroad advised the New Haven trustees that they should disaffirm the lease of the P & W line. Pursuant to Pennsylvania Railroad's request, the New Haven trustees disaffirmed the P & W lease on January 16, 1967 and in May of that year filed with the ICC an amendment to the New Haven reorganization plan. Under the terms of the reorganization agreement the merging parties, now the Penn Central Transportation Company (Penn Central), would continue to operate the line, but for the account of P & W rather than as lessee.

Mindful of the experience of other railroads, P & W was apprehensive about the potential injury it might suffer if its properties were so operated for its account. It therefore opposed disaffirmance of the lease and strongly urged that its line be included in the Penn Central operation. Hard fought proceedings ensued, during which the merging parties objected to P & W's inclusion in the merger and to having to assume the restrictive character of the voting provisions of P & W's charter. The ICC reached a compromise with the merging parties and sustained P & W's vigorous efforts to be part of the Penn Central operation, but subject to the condition that the charter provisions concerning voting be amended to provide for one vote for each share of P & W stock.

Meanwhile, the proposed merger of the former Rhode Island-Massachusetts corporation into a newly formed Delaware corporation, mentioned above, was presented

to P & W's stockholders on September 11, 1968 prior to the ICC's "one share, one vote" stipulation and before Penn Central's acquisition of the New Haven's P & W stock. The agreement of merger was signed on December 9, 1968, one week after the ICC had entered its order directing P & W to change the Article Ninth provision of its charter. The ICC approval of the merger agreement was rendered on February 18, 1969.

Under the compromise, P & W had been given until June 30, 1969 to eliminate the restrictions on voting in its charter. Approximately two months prior to that deadline Penn Central and P & W stipulated to an extension of time for P & W to correct its charter until December 31, 1969. According to the terms of the stipulation, which gave recognition to Penn Central's objection to P & W's new Delaware certificate of incorporation, Penn Central agreed not to file suit attacking the P & W charter before the December 31, 1969 deadline. In return, P & W agreed not to raise this delay as a defense in any such action. Stipulations for further extensions ultimately extended the date to June 30, 1970.

Notwithstanding this reservation of rights, P & W perfected its Delaware incorporation on July 31, 1969, abandoning its New England legislative charters presumably for the advantages of being incorporated under the Delaware General Corporation Law.

Confronted with a choice between changing its charter-granted voting rights with the prospect of domination by Penn Central, or attempting to independently operate its own railroad for the first time in about eighty years, P & W reversed itself and withdrew its demand for inclusion in the Penn Central operations. At the same time, P & W applied to the ICC to take up independent operation of its railroad properties. Two months later, Penn Central went into reorganization under Section 77 of the Bankruptcy Act and the newly appointed trustees also shifted from the ear-

lier stance of the Penn Central management and now argued that P & W *should* be included in its operation.

Ultimately, on August 25, 1967, the ICC sustained P & W's right to operate independently. It was to begin separate operation on December 30, 1972. It actually resumed possession and operation of its properties on February 3, 1973.

Earlier, in July, 1972, the controversial amendment to P & W's certificate, which retains the voting ratios but increases the numbers proportionate to the increase of authorized stock, was passed at a stockholders' meeting. P & W sought ICC approval of the amendment over the opposition of the trustees who took that opportunity to challenge the legality of P & W's voting provisions. The complaint in this action, which will determine the merit of P & W's submission was filed October 10, 1972. The case was delayed by a lengthy effort to resolve the dispute without litigation here.

This rather intricate history of the economic relations among the parties is particularly relevant to the propriety of the action being maintained as a class action, in that it puts into sharp perspective the competitive posture of the parties in relation to the P & W properties. Significantly, when the P & W began independent operation in 1973, it was, and remains, in direct competition with the Penn Central which operates another line through the same general area. In a real sense, the action is a struggle for control over those properties through control of the corporation itself.

I turn initially to the question of whether the suit may be maintained as a class action. Court of Chancery Rule 23(c)(1). The class which plaintiffs purport to represent consists of all P & W stockholders who presently own 51 or more shares. As of May 10, 1972, the record date for the July, 1972 special meeting of P & W stockholders, P & W had a total of 618 stockholders, of whom 87 owned 51 or more shares.

In order to prevail on their motion to establish this suit as a class action, the plaintiffs must meet the tests set forth in Rule 23. Professor Moore has summarized the general requisites of Rule 23 as follows:

> "Hence the complaint, or other pleading initiating the class action, should allege the existence of the necessary facts showing that the prerequisites of subdivision (a) are satisfied, i. e., the existence of a class and that the named representative is a member thereof, that the members thereof are so numerous as to make joinder impracticable, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical, and the representative parties will fairly and adequately protect the interests of the class; and that the action falls within at least one of the three categories of class actions enumerated in subdivision (b)." 3B *Moore's Federal Practice* (2nd ed.) ¶ 23.02–2 at 23–153.

The plaintiffs maintain that the Rule 23 requisites for allowing this case to proceed as a class action are unmistakably met in this instance. They contend that the question of the validity of the voting restrictions provides a common denominator of law and fact as to all those who own 51 or more shares, because ownership of 51 shares is the threshold beyond which the restrictions apply. Indeed, all those who own at least 51 shares share a common disability in that they do not possess a vote for each share which they own. Plaintiffs thus contend that the interests of all such shareholders are identical in the central claim asserted, the effort to seek full enfranchisement. And, it is the validity of their disenfranchisement which this action ultimately seeks to determine. Secondly, in support of their claim that the numerosity requirement is satisfied, plaintiffs point to the 87 widely scattered and relatively small stockholders whose joinder would be impracticable. They further emphasize the salutary policy of the Rule, which is to ensure that mere numbers will not impede

large groups of individuals from enforcing their rights. *Delaware · Bankers Association v. Division of Revenue,* Del.Ch., 298 A.2d 352, at p. 354, 1972. Finally, the plaintiffs contend that the claims and defenses of the representatives are typical of the class and also that the interests of the class will therefore be adequately protected by plaintiffs. In support of this position they assert that the relief sought in the complaint "will operate to the uniform benefit of all P & W stockholders owning more than 51 shares, and to the detriment of none."

With respect to compliance with Rule 23(b), concerning the type of action, plaintiffs identify themselves within Rule 23(b)(2) by arguing that the defendant's refusal to change the voting restrictions is generally of legitimate interest to the class as a whole. This contention appears sound and I would agree that plaintiffs fit the type defined in Rule 23(b)(2).

Notwithstanding plaintiffs' compliance with Rule 23(b), their position as to subsection (a) of that rule is untenable. For clearly, plaintiffs' interest is such that they cannot properly represent the purported class. Even assuming that joinder of the parties is impracticable in view of both the large number of potential plaintiffs and their wide geographical distribution, and assuming further that the questions of law and fact are indeed common to the class, nevertheless this action cannot be maintained as a class suit. This is so because plaintiffs' interests are so unique as to make their representation of the purported class inadequate and unsatisfactory. Simply stated, plaintiffs' definition of the class, i. e. all those stockholders who own 51 or more shares, overlooks several elements, supported by the factual circumstances, which really put them into a distinct class by themselves.

The most striking of these factors is the simple fact that by eliminating the charter provision which specifically limits any single shareholder to a maximum number of

votes of no more than those representing 25 percent of the entire number of issued shares operates to the immediate benefit of the plaintiffs *only* and not to the benefit of any other shareholder. The plaintiffs who possess 28 percent of the shares are the only shareholder owning more than 25 percent of P & W's stock.

In the second place, it cannot conclusively be said that the present voting provisions operate to the detriment of every stockholder within the designated class. Plaintiffs' assumption is that all shareholders would be "benefited" by granting each of them voting rights. But this action does not seek a monetary judgment which would obviously be to each shareholder's advantage. Instead, it seeks a change in the corporation's voting rules which is the basic and underlying issue in this suit. Elimination of the voting restrictions cannot automatically be assumed beneficial to the shareholders in plaintiffs' class, since they may want the plaintiffs to be restricted.

Potentially then, the plaintiffs stand in an adversary relationship to every other shareholder since they represent the largest single block of stock and no other shareholder owns 25 percent or more of the issued shares. Being thus unique and separate from all other members of the purported class, it is difficult to conceive of how plaintiffs can assert their ability to "fairly and adequately" protect the interests of the class, as that concept is employed in Rule 23. Unless it can be assumed that plaintiffs know better than other members of the class (who may favor retention of the 25% restriction) just what is in their best interest, they simply fail as competent representatives.

Furthermore, there is also the fact that most of those shareholders who fall into the proposed class have, at one time or another, voted for the very provisions which plaintiffs seek to nullify. When the merger of P & W's successor into the present Delaware corporation was submitted to the shareholders for a vote, the proxy materials disseminated in connection therewith included the corporation's charter which in turn contained the voting provisions. The shareholders overwhelmingly approved the merger and therewith the certificate containing the unique voting requirements. In fact, of the stockholders owning 51 or more shares in P & W, only two registered negative votes. The vast majority of stockholders supposedly included in the class and therefore affected by the voting scheme actually voted in favor of the provisions. And, at the special meeting convened to consider the disputed amendment to the charter, of the 87 shareholders holding 51 or more shares, 66 voted in favor of the amendment, 19 abstained, and only 2 voted against it. Moreover, none of the members of the proposed class have taken any action either individually or in concert with plaintiffs which would indicate their support of the plaintiffs' position, and this is true even in spite of the fact that the provision to which plaintiffs object has existed in P & W's charter since 1844.

Finally, there is the consideration that this litigation is a struggle for control over the operations of P & W. It is difficult to separate the legal and academic issues in this action from the reality of the competitiveness of the parties' relationship. The plaintiffs' interest in pursuing this case is to increase its influence over P & W. And it is obvious that at least some of the over-50-share P & W stockholders, the class defined by plaintiffs' motion, are in an actually, rather than merely potentially, adversary position to the plaintiffs. The complaint suggests this fact in stating that numerous P & W shareholders have large beneficial interests in P & W shares, but fragmented into small blocks. Their real pocketbook interest would seem more compatible with P & W in resisting full enfranchisement (so as to retain their individual controlling status) than with the aims of the trustees of Penn Central. This conflict of interest between plaintiffs and others of the class which they would repre-

sent is intensified by the existence of substantial business claims of P & W against Penn Central, for whom plaintiffs are trustees.

██ In conclusion, I hold that plaintiffs' motion to maintain this suit as a class action must be denied, because their claims are not typical of the claims of the class and, more importantly, because the conflicts inherent in the parties' relations make it doubtful that plaintiffs could fairly and adequately represent the interests of the class. IT IS SO ORDERED. Thus, the trustees are left with a claim for relief in their own right. I decline to express an opinion one way or another respecting the argument urged by defendant, i. e. that the corporate questions involved in this case are more properly pursued by individual shareholders. The plaintiffs are in any case relegated to asserting their challenges individually since the class action device is both inappropriate and inapplicable here.

Next, consideration must be accorded the substantive issue in the parties' cross-motions for summary judgment, namely, whether the voting provisions set forth in P & W's certificate of incorporation can withstand legal scrutiny.

Plaintiffs' complaint attacks both P & W's existing Certificate of Incorporation provisions, as well as the proposed amendment to these, both of which present essentially the same questions for determination, since both have the identical feature of restricting the number of votes a shareholder may cast to less than the number of shares held by that shareholder.

The plaintiffs argue that the voting provisions of the charter violate 8 Del.C., § 151(a) since they provide for discriminatory voting rights among shares of a single class of stock. 8 Del.C., § 151(a) deals with the nature of stock which a Delaware corporation may issue and provides:

"(a) Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation. The power to increase or decrease or otherwise adjust the capital stock as provided in this chapter shall apply to all or any such classes of stock."

In support of their position that the voting arrangement in P & W's charter is not permitted under Delaware law, plaintiffs urge that § 151(a) speaks only in terms of "classes or series" of stock with respect to various powers or rights. They insist that there is no language in the statute which sustains discrimination in voting rights within a single class. Rather, they say that the statute is plainly worded in terms expressing uniformity within classes and addresses itself to rights associated with "classes" or "series". Plaintiffs argue that a corporation may lawfully discriminate between classes or series of stock, investing one class with voting rights different from another, but it is precluded from granting a given share of stock any more or less voting rights than given any other share within the same class or series. In essence, what plaintiffs object to is the assignment of differing rights on an individual stockholder basis, since each shareholder's total number of shares determines the extent of his voice in the corporation's affairs and not the voting incident of each share.

In response to the arguments raised by plaintiffs, the defendant contends that the emphasis of the Delaware General Corpo-

ration Law has always been to allow tremendous flexibility to corporations in providing for the conduct of their affairs and has been widely copied as a result of this very feature. They point to Section 102(b)(1) of Title 8 which expresses this concept of flexibility by permitting the corporate charter to contain a full range of lawful provisions. That section lists the matters allowable in the certificate:

"Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the members of a nonstock corporation; if such provisions are not contrary to the laws of this State."

Finally, the defendant argues that voting rights are strictly a matter of internal corporate management and that the voting scheme as it now stands more closely embodies the concept of "corporate democracy" (which, incidentally, is also argued by plaintiffs).

The problem, as I view it, turns initially upon the question of whether 8 Del.C., § 151(a) is dispositive of the challenges raised by the plaintiffs in this action. That is, if the statute can be read to either permit or prohibit distinctions in voting rights within a single class, then defendant's more general public policy arguments are either irrelevant or unavailing. If, on the other hand, it should ultimately be established that § 151(a) does not fully resolve the problem, the public policy of the State should be considered. That inquiry would undoubtedly focus upon the trade-offs involved between favoring more freedom for investors to enter into any legal contract concerning their voice in the corporation's management, and the concept of a "one share, one vote" policy in the name of "corporate democracy". Finally, it may be necessary to examine whether the manner in which Penn Central acquired its shares is significant.

■ Evidently, perhaps due to the historic nature of the charter privisions, our courts have never before been confronted with the issue of the legality under § 151(a) of the type of voting provisions which are challenged in this action. Thus, this case is one of first impression. I begin with the proposition that, absent a valid charter provision to the contrary, each share of stock in a Delaware corporation is entitled to one vote. That principle is expressly set forth in 8 Del.C., § 212(a):

"Unless otherwise provided in the certificate of incorporation . . . each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder."

Thus, unless P & W's charter provision is found to be lawful, the "one share, one vote" concept comes into play. Indeed, the general grant of authority in 8 Del.C., § 102(b)(1) distinctly allows diversified stockholder rights only "if such provisions are not contrary to the laws of this State."

■ Secondly, it should be noted that Section 151(a) was, in fact, an effort by our Legislature to provide a Delaware corporation with the means of creating flexible financing to meet differing economic conditions. Folk, *The Delaware General Corporation Law*, § 151, p. 108. Clearly, the statute is liberal enough to permit differing rights for differing shares. And, the history of this provision bears this idea out and substantiates defendant's insistence that the true intent of the provision was to broaden the permissible types of stock a corporation may issue, though with certain qualifications.

■ The Delaware Constitution of 1897, in Article 9, Section 6 specifically contained a "one share, one vote" rule. The purpose of such a provision was described in *Brooks v. State*, Del.Supr., 3 Boyce 1, 79 A. 790, 801 (1911) as follows:

" . . . the purpose of the convention [that adopted the section] was to change the control of stock corporations from

individual control to stock control, to do which it directly gave to a share of stock the quality of a vote. In doing this it made no discrimination between different classes of stock which subsequent laws might authorize, but provided generally that the holder of a share of stock was the holder of a vote which he was entitled to cast. Being the holder of an interest in property that conferred upon him the right pro tanto to control and regulate that property, the holder of a share of stock was then possessed of a personal privilege or benefit which he might use or reject as he chose . . . ."

Thus, this concept of stock ownership carried with it the idea that by the possession of a share the owner was possessed of a privilege inherent in the share itself. In 1903 that provision was repealed and is absent from our present Constitution as well. But the repealer was not a complete rejection of the "one share, one vote" rule. Nor was it a grant of absolute power to a corporation created under the then new Delaware General Corporation Law, 22 Del.Laws, Ch. 167, to impose *any* type of restrictions of which it could conceive. Rather, it was designed to legalize the arrangement enacted in Section 13 of the early General Corporation Law, the statutory predecessor of our present § 151(a) providing substantially the language of the present section for classes of stock with stipulated, and perhaps differing, voting rights. Thus, although the repeal of the constitutional provision did in fact make way for greater flexibility in devising voting schemes it did so by legalizing those voting structures permissible under what is now § 151(a). It did not, as defendant would urge, pave the way for *any* conceivable distribution of voting rights.

 Turning to the language of the statute itself, without question, a reading of § 151(a) leaves one with the firm conviction that "classes" may be invested with differing voting rights but that particular

shareholders within one class of stock may not. The statute speaks only in terms of "classes" and unequivocally and repeatedly refers to differentiating only on the grounds of class. Although the same result could be achieved through the use of more than one class of stock, and in such a case the same voting scheme would be legitimate, this is not an anomalous result in our corporation law. It is generally recognized that our courts have, in corporate cases under our statute, followed somewhat strictly the form established by the Legislature. Folk, *The Delaware General Corporation Law*, (1972), § 271 at p. 424. This concept has been repeatedly employed in the area of reorganizations where it has been held that the sale of assets statute and the merger statute are independent of each other. Thus, the framers of a reorganization plan may resort to either type of corporate mechanics to achieve the desired end, and if it chooses one way it need not observe statutory or common law requirements applicable to the way not chosen. *Hariton v. Arco Electronics, Inc.,* Del.Supr., 41 Del.Ch. 74, 188 A.2d 123 (1963); *Langfelder v. Universal Laboratories,* 68 F.Supp. 209 (D.Del.1946). Thus, it is a traditional Delaware doctrine that statutory form is of great consequence in the corporate area.

 Thus, I am compelled to conclude, after a consideration of both the evolution of § 151(a) and the language of its provisions, that the divergent voting rights in issue here are not permissible since they are not on a class basis. Likewise, defendants invocation of public policy which it contends favors flexibility and liberally allows corporations to design their stock consistent with their needs, cannot override the language of § 151(a). P & W's charter was granted under the Delaware Corporation Law and it is thereby subject to its strictures. As noted by the court in the *Brooks* case: "A provision in a charter of a corporation giving to its stock a voting power different from that contemplated by the statute under which it was created, is

likewise void. . . ." *Brooks v. State, supra*, 79 A. at 800.

There are of course legitimate reasons why many railroad companies which incorporated in the 19th century included such voting provisions in their charters. Such restrictions were intended as a means of preventing any single shareholder from dominating the affairs of the corporation *through* mere ownership of stock. But the restrictions were permitted in the charters of such companies largely because the corporations so chartered owed their existence to legislative enactment. And such charters could thereby be tailor-made to suit the needs of those companies so long as they did not violate the Constitution. But P & W is *not* now chartered under a special legislative act. It is chartered under the Delaware General Corporation Law and it therefore must comply with the requirements of that law.

■ While the defendant may insist that full disclosure of the nature of the P & W stock, including the unusual voting rights accorded it, was present in this instance, and that investors who pruchased the stock did so with full knowledge, or at least notice, of its characteristics, the defects inherent in P & W's charter are not thereby cured. Besides, the trustees of Penn Central cannot be considered to have purchased their shares with notice, at least in the sense of a free contract resulting from an arm's length transaction. It is more likely that the manner in which plaintiffs acquired their stock, i. e. through the complex compromises connected with the Pennsylvania Railroad, New York Central and New Haven merger, and eventually through reorganization proceedings, would have an insulating effect upon them. At any rate, the argument of full disclosure and knowledge of the charter loses some of its force under such factual circumstances.

■ I therefore conclude that the challenged voting provisions in P & W's

charter providing for voting power based ·upon the size of an individual shareholder's holding, are violative of 8 Del.C., § 151(a). Similarly, for the reasons which make these voting restrictions invalid, the 25% maximum voting limit contained in the charter must also be eliminated. It is perhaps regrettable that the great flexibility which is generally a salutary feature of our corporation law must give way to the manifest language of the statute, but our courts are not in a position to disregard the patent directives of our statutory law in order to respond to public policy. Since the voting arrangement as it presently exists in P & W's certificate is null and void and must be eliminated, defendant is in effectively the same position had its charter contained no voting provision at all. Since 8 Del.C., § 212(a) provides that, absent a valid charter provision to the contrary, each share of stock in a Delaware corporation is entitled to one vote, hereafter, for each share of defendant's stock there shall be one vote.

There remains for consideration the plaintiffs' attack upon defendant's quorum requirements. Article Ninth of P & W's certificate of incorporation also provides in part:

> ". . . at all meetings stockholders, holding or representing by proxy not less than 2500 shares, shall be necessary to constitute a quorum."

The complaint denies the validity of the above quoted portion of Article Ninth as well as the proposed amendment to it which would increase the quorum requirement in proportion to the twenty-fold increase in authorized stock to ". . . stockholders holding of record not less than fifty thousand shares . . ." Plaintiffs' challenge is grounded on the assertion that neither the certificate nor the proposed amendment gear the quorum definition to the voting power of the stock required to be present. And, since a stockholder's holding does not reflect the num-

ber of shares he is entitled to vote, compliance with 8 Del.C., § 216 becomes impossible. That section provides:

"Subject to the provisions of this chapter in respect of the vote that shall be required for a specified action, the certificate of incorporation or by-laws of any corporation may specify the number of shares and/or the amount of other securities having voting power the holders of which shall be present or represented by proxy at any meeting in order to constitute a quorum for, and the votes that shall be necessary for, the transaction of any business."

I am of the view that the quorum provision in P & W's charter conflicts with § 216 if the voting restrictions were valid. In view of my finding above that the voting provisions of P & W's charter are invalid, a change in conformity with this decision automatically has the effect of validating P & W's otherwise deficient quorum provision.

Finally, it is necessary to examine the affirmative defenses raised by P & W in its effort to bar the relief which would otherwise be available to plaintiffs. In essence, each of these asserted defenses, i. e. laches, acquiesence, waiver, and estoppel, relate in one way or another to the fact that the challenged provision respecting voting rights has been a part of P & W's certificate of incorporation since the formation of its predecessor corporations in 1844, together with the fact that neither the trustees nor their predecessor in interest have ever before questioned the validity of that provision. But, as is emphasized by the plaintiffs, the facts simply do not support P & W's charge that Penn Central, and later the trustees, unreasonably delayed in the assertion of their rights resulting in prejudice to the defendant.

In the first place, Penn Central acquired the New Haven's P & W stock involuntarily on December 31, 1968 by order of the Reorganization Court, having expressly objected to the P & W charter provisions in question prior to its acquisition of the stock. In fact, when the ICC approved inclusion of P & W in the Penn Central merger, a condition precedent was amendment of the P & W charter to provide for a "one share, one vote" arrangement.

Meanwhile, P & W prepared to merge its predecessor New England corporations into the Delaware corporation specifically formed for that purpose in May 1969. Significantly, at that time, P & W obtained a stipulation from Penn Central promising not to file suit attacking the voting provisions in its charter until a future date. It was further stipulated that any delay in filing a lawsuit would not give rise to a laches defense.

The trustees of Penn Central who took over its assets after Penn Central went into reorganization in 1970 also objected to the proposed charter amendment (increasing the number of shares) and when P & W sought ICC approval of the amendment the trustees persisted in their protests against the voting provision. The record is thus manifest with expressions of dissatisfaction from Penn Central and the trustees in connection with the voting scheme contained in P & W's charter.

But, defendant's invocation of laches is based upon the fact that even if the trustees of Penn Central voiced their objections to the provisions in a timely fashion, they are nevertheless bound by the long delay and acquiescence of their predecessors in interest. But that contention overlooks the fact that plaintiffs' challenge of the charter provision is based on an alleged violation of the *Delaware* corporate law. And P & W did not incorporate in Delaware until May of 1969. Therefore, even though the discriminatory provision was a part of P & W's charter since 1844, when it was dually incorporated in Rhode Island and Massachusetts, the defense of laches can only be considered from and after the date of P & W's incorporation in the State of Delaware. Besides, it may very well be

849

true that the charter provision was not in violation of any Rhode Island or Massachusetts law. Moreover, even before May, 1969, Penn Central had expressed its dissatisfaction with P & W's voting scheme. In December of 1968, before Penn Central acquired the New Haven's P & W stock, it objected to the voting provisions and sought to have them eliminated.

■ Furthermore, since Delaware law is explicit in its statutory requirement that differing voting rights are permissible only on a class basis, the provisions in the P & W charter inserted contrary to § 151(a) are absolutely void and not merely voidable. Simply stated, the corporation had no power or authority from the State to assign voting rights in the manner in which it did. See also *Triplex Shoe Co. v. Rice & Hutchins, Inc.*, Del.Ch., 17 Del.Ch. 356, 152 A. 342 (1930) wherein the Court upheld the stockholders' position that the corporation's stock was illegally issued in spite of the fact that the objecting shareholders had previously and repeatedly voted their common stock without protest. The shareholders' objection prior to the meeting in question was held to be timely and the challenged stock was held to be absolutely void since the corporation had no grant from the State to issue it.

Plaintiffs point out a practical observation with respect to defendant's invocation of laches. The amendment, which is equally challenged in this action for the same basic reasons as the original charter provision, cannot possibly be subject to a laches defense. This is so because the trustees objected to the amendment at the time it was proposed and ultimately cast their votes against it. And, if the amendment fails to conform to Delaware law, clearly, the basis for its invalidity will apply with identical force to the present charter provision. Admittedly, once this Court determines the validity of the amendment, the validity of the underlying provision has automatically been determined.

Even ignoring the practicalities of the matter, the present record itself cannot support defendant's contention that the plaintiffs unfairly and unreasonably failed to act with the promptness required by the circumstances.

In view of the foregoing, plaintiffs' motion for summary judgment is hereby granted permanently enjoining the filing of the proposed amendment to P & W's charter. In addition, the provisions of Article Ninth in its present form are invalid to the extent that they provide for differing voting rights for shares within the same class. Voting hereafter shall be on a one share, one vote basis. IT IS SO ORDERED. Defendant's motion for summary judgment is denied. IT IS SO ORDERED.

SHALOM.