# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KRYSTYN COLON, on behalf of herself and all other similarly situated stockholders of BUMBLE, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2022-0824-JTL |
| BUMBLE, INC., WHITNEY WOLFE HERD, and BLACKSTONE, INC., | ) ) ) ) | |
| Defendants. | ) | |

## OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Date Submitted: June 13, 2023
Date Decided: September 12, 2023

Gregory V. Varallo, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Peter B. Andrews, Craig J. Springer, David M. Sborz, Andrew J. Peach, Christopher P. Quinn, Jackson E. Warren, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Thomas Curry, Tayler D. Bolton, SAXENA WHITE P.A., Wilmington, Delaware; Mark Lebovitch, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Brian Schall, THE SCHALL LAW FIRM, Los Angeles, California; *Attorneys for Plaintiff*.

Raymond J. DiCamillo, Kevin M. Gallagher, Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jonathan K. Youngwood, Craig S. Waldman, SIMPSON THACHER & BARTLETT LLP, New York, New York; Jacques J. Lamothe, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California; Kevin J. Orsini, Rory A. Leraris, CRAVATH, SWAINE & MOORE LLP, New York, New York; Dana M. Seshens, Kyra M. Kaufman, DAVIS POLK & WARDWELL LLP, New York, New York; *Attorneys for Defendants*.

**LASTER, V.C.**

The plaintiff challenges two provisions in the certificate of incorporation of Bumble, Inc. (the "Company"). In simplified form, those provisions contemplate that each share will carry one vote, unless the share is owned by a "Principal Stockholder," in which case it will carry ten votes. The Principal Stockholders are defined as the parties to a publicly disclosed stockholders agreement. Currently, there are only two Principal Stockholders: the Company's founder, Whitney Wolfe Herd, and its financial sponsor, Blackstone, Inc.[1]

The plaintiff calls this "identity-based voting" and says it violates Sections 212(a) and 151(a) of the Delaware General Corporation Law (the "DGCL"). The plaintiff seeks a declaration that the challenged provisions are invalid. The parties filed cross-motions for summary judgment. This decision holds that the challenged provisions are valid.

## I.     FACTUAL BACKGROUND

The pertinent facts are undisputed.[2]

## A.     The Company

The Company is a Delaware corporation that operates a suite of online applications that enable users to make connections by initiating romantic relationships, forming friendships, and expanding their professional networks. Herd founded the Company in

---

[1] Technically, there are more, because Blackstone holds its shares through various affiliates, and they are the actual parties to the stockholders agreement. While important for many reasons, the distinction between Blackstone and its affiliates is not pertinent to this decision, which ignores it.

[2] Citations in the form "DX __" refer to exhibits attached to the Transmittal Affidavit of Caroline M. McDonough, dated December 23, 2022.

2014 and serves as its chief executive officer. Blackstone is the Company's largest outside investor.

In 2021, Herd and Blackstone took the Company public using a bespoke governance structure. They sought to create a single capital structure that combined the benefits of two typically separate structures: an Up-C structure and a dual class voting structure.

### 1.     A Standard Up-C Structure

The "Up-C" in "Up-C structure" refers to "umbrella partnership and C corporation." A standard Up-C structure enables insiders to gain the benefits associated with a public listing without giving up the benefits associated with pass-through tax treatment. To eat that cake and still have it requires two entities: an umbrella partnership and a C corporation. It also requires that the C corporation issue two classes of stock.

The umbrella partnership owns the operating business. It is usually a limited liability company, but it can be any type of entity that can qualify as a partnership for tax purposes. When the umbrella partnership is an alternative entity, its equity interest is usually divided into units.

The C corporation is a holding company. It owns some, but not all, of the LLC units. The insiders taking the company public own the rest.

The certificate of incorporation for the holding company authorizes two classes of stock. The Class A stock is straight common stock. Each share carries one vote per share and reflects a proportionate economic ownership interest in the corporation. The Class B stock only carries voting rights. Each share carries one vote per share, but it does not reflect any economic ownership in the corporation.

2

The holding company becomes the publicly listed entity. In the initial public offering, the holding company issues Class A shares to the public. Insiders receive Class B shares. The number of units issued by the LLC is adjusted to match the number of outstanding shares.

The result is a hybrid entity in which public investors participate in governance and economically through their Class A shares. Insiders participate in governance through their Class B shares and economically through their LLC units. As holders of LLC units, insiders retain the benefit of pass-through tax treatment. The insiders also gain the benefits of liquidity because the Up-C transaction documents authorize an insider to convert one Class B share plus one LLC unit into one publicly traded Class A share. After conversion, the Class A share can be sold.

### 2. A Standard Dual Class Voting Structure

A standard dual class voting structure enables insiders to gain the benefits associated with a public listing without giving up the prerogatives and perquisites of control, even if their economic ownership falls below a majority. To eat that cake and still have it requires at least two classes of stock, each with different voting rights.

In a typical dual class voting structure, Class A shares might carry one vote per share, while Class B shares might carry ten votes per share. In the initial public offering, the corporation issues Class A shares to the public. The insiders receive Class B shares.

The additional voting power carried by the Class B shares enables the insiders to preserve their control. Even if the corporation issues Class A shares reflecting a majority of the corporation's economic value, those Class A shares will not carry a majority of the

corporation's voting power. At a ten-to-one ratio for voting rights, the Class B stockholders can exercise hard control with only 10% economic ownership. They can exercise working control at still lower levels. If the corporation creates and issues an additional class of non-voting stock, then the insiders can perpetuate their control regardless of the level of economic ownership.

### 3. Two Structures In One

An Up-C structure and a dual class voting structure both use two classes of stock, but they use them for different purposes and in different ways. In an Up-C structure, the two classes have the same voting rights but different economic rights, enabling the insiders to gain the advantages of a public listing while keeping the benefits of pass-through tax treatment. In a dual class voting structure, the two classes have the same economic rights but different voting rights, enabling the insiders to gain the advantages of a public listing while keeping the prerogatives and perquisites of control. Through the Company's bespoke governance structure, the insiders sought to do both. That required some transactional engineering.

As in a standard Up-C structure, the Company owns an alternative entity that is treated as a partnership for tax purposes. For the Company, that entity is a limited partnership named Buzz Holdings L.P. Its limited partnership interest is divided into units. The Company owns some of the units, and Herd and Blackstone own the rest. As in a standard Up-C structure, the holder of a unit can convert it into a Class A share, but under the Company's structure, the exchange happens based on a formula (the "Exchange Rate"). The formula currently calls for a one-for-one exchange. *See* DX 3 at 5.

4

As in a standard Up-C structure, the Company's charter authorizes both Class A common stock and Class B common stock. *See* DX 4 at 1. The Class A common stock carries both voting rights and economic rights. The Class B stock carries only voting rights without any economic rights. DX 4 at 2–4.

For the drafters tasked with combining two structures into one, the challenge lay in layering on differential voting rights. To achieve the functional equivalent of a dual class voting structure, the charter provides that each Class A share carries one vote, unless that share is held by a Principal Stockholder, in which case it carries ten votes. The operative language states:

> Each holder of record of Class A Common Stock, as such, shall be entitled to one vote for each share of Class A Common Stock held of record by such holder on all matters on which stockholders generally or holders of Class A Common Stock as a separate class are entitled to vote (whether voting separately as a class or together with one or more classes of the Corporation's capital stock), provided however, that . . . each Principal Stockholder shall be entitled to ten votes for each share of Class A Common Stock held of record by such Principal Stockholder on all matters on which stockholders generally or holders of Class A Common Stock as a separate class are entitled to vote (whether voting separately as a class or together with one or more classes of the Corporation's capital stock) . . . .[3]

The charter defines "Principal Stockholder" by referencing a definition that appears in a separate, publicly disclosed stockholders agreement that the Company, Herd, and

---

[3] DX 4 at 2 (the "Class A Voting Provision"). This text quoted above the line omits language (i) authorizing a Principal Stockholder to waive their right to exercise ten votes per share, (ii) providing for the high-voting right to sunset seven years after the initial public offering or if the Principal Stockholders hold less than 7.5% of the equity, and (iii) depriving Herd of her right to ten votes per share if she is no longer an employee or member of the Board.

Blackstone executed. DX 5. That agreement defines Principal Stockholders as any party to the agreement other than the Company. *Id.* at 4, 7.

In a standard Up-C structure, insiders receive a number of Class B shares equal to the number of units they hold, creating a one-for-one correspondence between the Class B shares that carry voting rights and the units that carry economic rights. The Company did not take that course. It issued only two Class B shares, one to Herd and one to Blackstone. The charter provides that each share of Class B stock carries a number of votes equal to the number of Class A shares that the holder would receive if all of its units were converted into Class B shares at the Exchange Rate *and* with a Principal Stockholder receiving ten votes per Class A share. In stunningly complex language, the provision states:

> Each holder of record of Class B Common Stock, as such, shall be entitled, without regard to the number of shares of Class B Common Stock (or fraction thereof) held by such holder, to a number of votes that is equal to the product of (x) the total number of Common Units . . . held by such holder as set forth in the books and records of Buzz Holdings L.P. multiplied by (y) the Exchange Rate (as defined in the Exchange Agreement) (the product of (x) and (y), the "Entitled Votes"), on all matters on which stockholders generally or holders of Class B Common Stock as a separate class are entitled to vote (whether voting separately as a class or together with one or more classes of the Corporation's capital stock), provided, however, that until the Sunset Date, each Principal Stockholder shall be entitled, with respect to the shares of Class B Common Stock (or fraction thereof) held by such Principal Stockholder (and without regard to the number of shares of Class B Common Stock (or fraction thereof) held by such holder), to a number of votes that is equal to the product of the number of Entitled Votes such Principal Stockholder would otherwise be entitled with respect thereto pursuant to the preceding provisions of this sentence multiplied by ten (10) on all matters on which stockholders generally or holders of Class B Common Stock as a separate class are entitled to vote (whether voting separately as a class or together with one or more classes of the Corporation's capital stock). . . .

DX 4 at 3 (the "Class B Voting Provision").

Herd owns 25,000,817 units, so assuming she could convert her units into Class A shares on a one-for-one basis, her Class B share carries 250,008,170 votes. Blackstone owns 34,356,242 units, so assuming it could convert its units into Class A shares on a one-for-one basis, its Class B share carries 343,562,420 votes.

The Class A and Class B shares vote together as a single class on all matters submitted to a vote of the stockholders generally. Based on the Company's calculations in its most recent proxy statement, the Class A Voting Provision and the Class B Voting Provision (together, the "Challenged Provisions") enable Herd and Blackstone to exercise 92.2% of the Company's outstanding voting power. DX 2 at 47.

In the Up-C IPO, the Company issued Class A shares to public investors, raising more than $2 billion. The Class A common stock continues to trade publicly on the NASDAQ under the ticker symbol BMBL.

## B. This Litigation

On September 16, 2022, the plaintiff filed this lawsuit on behalf of a class of similarly situated Class A stockholders. The complaint asserts that the Challenged Provisions conflict with Sections 151 and 212 of the DGCL. The defendants answered the complaint, and the parties filed cross-motions for summary judgment.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The parties agree on the facts. They only disagree about an issue of law: whether the Challenged Provisions violate the DGCL.

7

## A. The Statutory Analysis

A share of stock is a form of intangible property that reifies a bundle of rights that its holder can exercise. *See Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 679 (Del. 2020). Under the DGCL, the rights appurtenant to a share of stock must be set forth in the certificate of incorporation. By statute, however, the DGCL is a part of every certificate of incorporation. 8 *Del. C.* § 394. The DGCL sets out rights that shares of stock possess by default ("default rights"), and those rights are automatically incorporated into the certificate of incorporation.

The most familiar default rights are the rights to vote, sell, and sue. But a share of stock also carries other default rights, such as (i) the right to seek inspection of books and records under Section 220; (ii) the right to receive dividends when and as declared by the board of directors under Section 170; (iii) the right to participate pro rata in the residual distribution of the value of the corporation in liquidation under Section 280 or 281 of the DGCL, after the payment of creditors and the satisfaction of any liquidation preferences held by more senior stock; (iv) the right to seek an order compelling an annual meeting under Section 211(c) if a corporation has not held one in the last 13 months or otherwise fulfilled the requirement through action by written consent; (iv) the right to seek a determination of the rightful directors or officers of the corporation under Section 225; (v) the right to seek a determination of the validity of any stockholder vote; (vi) the right to sue for a receiver or custodian under Section 226 or 291; and (vii) the right to sue to enforce other provisions of the DGCL. *See* 8 *Del. C.* §§ 170, 211, 220, 225, 226, 280, 281,

291. The DGCL also acknowledges indirectly that a share of stock carries a default right to sue for breach of fiduciary duty. *See* 8 *Del. C.* §§ 102(b)(7), 327.

Because every charter incorporates the provisions of the DGCL, a share of stock possesses the default rights unless the charter expressly modifies them. A charter can also make a default right express. A charter can enhance a default right (make it stronger) and turn it into a superior right. A charter can limit or qualify a default right (make it weaker) and turn it into an inferior right. Some default rights, like the right to vote, can be eliminated entirely.[4] Some default rights are so significant that the charter cannot eliminate them. The right to obtain books and records under Section 220 is one such right. *See Juul Labs, Inc. v. Grove*, 238 A.3d 904, 919 n.14 (Del. Ch. 2020) (collecting authorities). The right to sue for breach of the fiduciary duty of loyalty is another. *See* 8 *Del. C.* § 102(b)(7); *CCSB Fin. Corp. v. Totta*, --- A.2d ---, 2023 WL 4628822, at *9 (Del. July 19, 2023).[5]

Because superior rights and inferior rights depart from default rights, they can be thought of as "special attributes." A charter can also grant new rights to a class of shares

---

[4] 8 *Del. C.* § 151(a) (providing that shares can have "no voting powers"). At least one class of stock must have voting rights that so that the corporation can fulfill its obligation to hold an annual meeting to elect directors. *See* 8 *Del. C.* § 211.

[5] The discussion above the line pertains to charter-based provisions that limit or eliminate default rights. A stockholder can freely choose whether or not to exercise a right, and a stockholder can contract in advance to assert a right in a particular way or not to assert it at all, thereby waiving it. The extent to which a stockholder can agree in a stockholder-level agreement to constrain its exercise of stockholder rights therefore differs from than the extent to which a charter can limit or eliminate those rights. *See generally New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520 (Del. Ch. 2023).

9

that are not based on default rights, or a charter can impose new qualifications or limitations on a class of shares that are not tied to default rights. Those are also special attributes.[6]

The DGCL requires that any special attributes appear in the certificate of incorporation. Sections 102 and 151 of the DGCL work together to generate this result.

Section 102(a) identifies the issues that a certificate of incorporation must address. 8 *Del. C.* § 102(a) ("The certificate of incorporation shall set forth . . . ."). Section 102(a)(4) specifies that if a corporation is authorized to issue stock, then the certificate of incorporation must provide information about the shares that the corporation can issue. If the corporation will issue stock that only has default rights, then the certificate of incorporation need only state the number of shares that the corporation can issue and their par value. The operative language states:

> If the corporation is to be authorized to issue only 1 class of stock, the total number of shares of stock which the corporation shall have authority to issue and the par value of each of such shares, or a statement that all such shares are to be without par value. If the corporation is to be authorized to issue more than 1 class of stock, the certificate of incorporation shall set forth the total number of shares of all classes of stock which the corporation shall have authority to issue and the number of shares of each class and shall specify each class the shares of which are to be without par value and each class the shares of which are to have par value and the par value of the shares of each such class.

8 *Del. C.* § 102(a)(4).

---

[6] Not all express rights are special attributes. Some express rights are simply default rights that the DGCL otherwise provides but which the drafters of the charter decided to make express. A frequent example is the right to vote, where a charter often will state that each share carries one vote, even though that is the default outcome under Section 212(a). *See* 8 *Del. C.* § 212(a).

If the corporation will issue stock that has special attributes, then Section 102(a)(4) provides two alternatives for memorializing the special attributes in the certificate of incorporation. One alternative is to specify the special attributes directly. The operative language addressing that alternative states:

> The certificate of incorporation shall also set forth a statement of the designations and the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, which are permitted by § 151 of this title in respect of any class or classes of stock or any series of any class of stock of the corporation and the fixing of which by the certificate of incorporation is desired.[7]

*Id.* The reference to "powers, preferences and rights" encompasses special attributes that confer superior rights. The reference to "qualifications, limitations or restrictions" encompasses special attributes that impose inferior rights. The "designations" refer collectively to any express rights, whether those are special attributes or default rights that are made express.[8]

---

[7] A corporation can create separate classes of stock or separate series of stock within a particular class. For purposes of default rights and special attributes, the same principles that apply to different classes of stock apply to different series of stock within a class. The main difference is that the existence of separate series may affect which shares are deemed part of the separate class for purposes of a class vote. *See* 8 *Del. C.* § 242(b)(2). For simplicity, this decision eschews repeated references to classes or series of stock and only refers to classes of stock. That editorial choice does not imply a substantive distinction.

[8] We do not know for sure whether the designations include default rights that the DGCL establishes and which are incorporated by reference into the charter under Section 394 but which have not been made express. *See* 8 *Del. C.* § 394. The answer to that question affects how Section 242(b) applies to amendments imposing inferior rights. *See* 8 *Del. C.* § 242(b)(2); *In re Snap Inc. Section 242 Litig.*, Consol. C.A. No. 2022-1032-JTL (Del. Ch. Mar. 29, 2023) (TRANSCRIPT).

The other alternative is for the corporation to authorize the board of directors to determine what special attributes the shares will have in a certificate of designations to be filed at a later date. The operative language addressing that alternative states:

> The certificate of incorporation shall also set forth . . . an express grant of such authority as it may then be desired to grant to the board of directors to fix by resolution or resolutions any thereof [i.e., powers, preferences and rights, and the qualifications, limitations or restrictions] that may be desired but which shall not be fixed by the certificate of incorporation.

8 *Del. C.* § 102(a)(4). When the board exercises its authority by adopting a certificate of designations that is filed with the Secretary of State, then the certificate of designations becomes part of the charter. *See* 8 *Del. C.* § 104. The grant of authority to a board to determine the special attributes that a class of stock will have is colloquially called blank check authority.

Section 102(a)(4) references Section 151 for a specification of what special attributes a class of stock can have. Section 151(a) states generally:

> Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation.

8 *Del. C.* § 151(a). This section generally authorizes a corporation to issue multiple classes of stock and makes clear that they may either carry default rights by implication, have some or all of the default rights specified expressly in the charter, or have whatever special

12

attributes the charter sets forth. The special attributes can be superior voting rights, preferences, or other special rights. Or the special attributes can be inferior voting rights, no voting rights, or other qualifications, limitations, or restrictions. Section 151(b) introduces another type of special attribute: any stock of any class or series may be made subject to redemption. 8 *Del. C.* § 151(b). The redemption right can be a superior right giving the stockholder the ability to put its shares to the corporation, or it can be an inferior limitation that gives the corporation the right to call the shares. *Id.*

Under Section 151, voting rights are simply one attribute of a class of stock. Section 212(a) provides that if the certificate of incorporation is otherwise silent, then each share of stock carries one vote by default. Section 212(c) also provides that if the certificate of incorporation calls for greater or lesser voting power, then references in the DGCL refer to that level of voting power. The operative language states:

> Unless otherwise provided in the certificate of incorporation and subject to § 213 of this title, each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder. If the certificate of incorporation provides for more or less than 1 vote for any share, on any matter, every reference in this chapter to a majority or other proportion of stock, voting stock or shares shall refer to such majority or other proportion of the votes of such stock, voting stock or shares.

8 *Del. C.* § 212(a). The reference to "§ 213 of this title" refers to the provision governing record dates and makes clear that the voting power that a stockholder can exercise is subject to the stockholder owning the shares on the record date used to determine the stockholders who can vote. Otherwise, Section 212(a) draws no distinction between the voting power that the stockholder can exercise ("each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder") and the voting power that each share

13

carries ("[i]f the certificate of incorporation provides for more or less than 1 vote for any share . . . every reference in this chapter to a majority or other proportion of stock, voting stock or shares shall refer to such majority or other proportion of the votes of such stock, voting stock or shares"). For purposes of Section 212(a), the number of votes that a stockholder can exercise per share is synonymous with the number of votes that the certificate provides for each share.

Section 212(a) thus both provides for a default right of one vote per share and acknowledges that the charter can specify a different number of votes per share ("[u]nless otherwise provided in the certificate of incorporation"). Nothing in Section 102(a)(4), 151(a), or 212(a) requires that the charter frame the voting power appurtenant to a share in terms of a specific number of votes per share. The charter can set out a formula or procedure for calculating that figure. Not only that, but Section 151(a) permits special attributes, including voting rights, to depend on facts ascertainable outside of the certificate of incorporation. The operative language states:

> Any of the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of any such class or series of stock may be made dependent upon facts ascertainable outside the certificate of incorporation or of any amendment thereto, or outside the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by its certificate of incorporation, provided that the manner in which such facts shall operate upon the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of such class or series of stock is clearly and expressly set forth in the certificate of incorporation or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors.

14

8 *Del. C.* § 151(a). The statute defines the term "facts" broadly such that it "includes, but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation." *Id.*

The Delaware Supreme Court and this court have approved charter provisions that allocate voting power using a formula or procedure. In *Providence & Worcester Co. v. Baker*, 378 A.2d 121 (Del. 1977), the Delaware Supreme Court upheld a scaled voting structure in which the number of votes appurtenant to a share varied depending upon the total number of shares that the owner held. The corporation's charter provided that each stockholder could cast one vote per share for its first 50 shares, then one vote for every 20 shares over the first 50, but in no event could the stockholder cast more votes than 25% of the total number of issued and outstanding shares. *Id.* at 121 n.2. Framed using the language of this decision, the certificate of incorporation departed from the default right of one vote per share to provide instead for inferior voting rights based on a fact ascertainable outside of the certificate of incorporation, namely the number of shares that the stockholder held.

In *Williams v. Geier*, 1987 WL 11285 (Del. Ch. May 20, 1987), this court dismissed a challenge to a tenured voting mechanism, holding that it complied with the DGCL. The charter provided that a share would carry ten votes if (i) the stockholder had owned it before the recapitalization that introduced the superior voting right or (ii) the stockholder acquired the share after the recapitalization and held it continuously for three years. Otherwise, a share carried one vote. Framed using the language of this decision, the certificate of incorporation departed from the default right of one vote per share by providing instead for

15

a superior voting right based on a fact ascertainable outside of the certificate, namely when the stockholder acquired its shares.

Finally, in *Sagusa v. Magellan Petroleum Corp.*, 1993 WL 512487 (Del. Ch. Dec. 1, 1993), *aff'd*, 650 A.2d 1306 (Del. 1994) (TABLE), this court dismissed a challenge to a per capita voting provision that gave each stockholder a single vote, regardless of how many shares the stockholder held, and the Delaware Supreme Court upheld the dismissal. Framed using the language of this decision, the certificate of incorporation used a mechanic conceptually similar to *Providence.* It departed from the default right of one vote per share by providing instead for an inferior voting right based on a fact ascertainable outside of the certificate, namely the number of shares the stockholder owned.

Under these authorities, the Challenged Provisions comply with DGCL. As required by Sections 102(a)(4) and 151(a), the charter sets out a formula that applies to all the shares in the class and that specifies how voting power is calculated. As authorized by Section 151(a), the formula makes the quantum of voting power that a share carries dependent on a fact ascertainable outside of the certificate of incorporation, namely the identity of the owner. The Class A formula is a simple one. If a Class A share is held by a Principal Stockholder, then it carries ten votes per share. If not, then a Class A share carries one vote per share. The Class B formula is complex but reaches the same result. As long as a Class B share is held by a Principal Stockholder, then then it carries ten votes per share for each Class A share that it could convert into. If the Class B share is not held by a Principal Stockholder, then then it carries one vote per share for each Class A share that it could convert into.

16

Under *Providence*, *Williams*, and *Sagusa*, having the level of voting power turn on the identity of the owner is permissible. To apply the formulas in *Providence*, *Williams*, and *Sagusa*, the corporation had to determine which stockholder owned the share. True, the processes also had to take into account another attribute. In *Providence* and *Sagusa*, it was how many other shares the owner held. In *Williams*, it was when the owner acquired the share. But the starting point in each mechanism was the identity of the owner. That is the same mechanism that the Challenged Provisions use.

The Challenged Provisions comply with the DGCL.

## B.     The Section 212(a) Argument

Contrary to the preceding analysis, the plaintiff argues that the Challenged Provisions violate Section 212(a) of the DGCL. The plaintiff does not rely on the text of the provision, but rather on language from the *Providence* decision. The plaintiff asserts that under *Providence*, a corporation cannot create a mechanism in which shares of the same class differ in their share-based voting power depending on who holds them.

Before discussing the *Providence* decision in greater detail, it is helpful to start with the Court of Chancery decision that the Delaware Supreme Court reversed. *Baker v. Providence & Worcester Co.*, 364 A.2d 838 (Del. Ch. 1976), *rev'd*, 378 A.2d 121 (Del. 1977). Recall that the scaled voting provision at issue in that case called for the number of votes per share that a stockholder could exercise to vary depending upon the total number of shares that the stockholder owned. A stockholder could cast one vote per share for its

17

first 50 shares, then one vote for every 20 shares over the first 50, but in no event could the stockholder cast more votes than 25% of the total number of issued and outstanding shares.[9]

In *Baker*, the Court of Chancery held that that the scaled voting provision violated Section 151(a). 364 A.2d at 847. The trial court reasoned as follows: (i) Section 151(a) was the governing provision; (ii) Section 151(a) required that all shares of the same class have the same voting rights; and (iii) the scaled voting provision violated Section 151(a) because the voting rights were not allocated "on a class basis." *Id.* In the words of the *Baker* decision:

> Turning to the language of the statute itself, without question, a reading of § 151(a) leaves one with the firm conviction that 'classes' may be invested with differing voting rights but that particular shareholders within one class of stock may not. The statute speaks only in terms of 'classes' and unequivocally and repeatedly refers to differentiating only on the grounds of class . . . .Thus, I am compelled to conclude, after a consideration of both the evolution of § 151(a) and the language of its provisions, that the divergent voting rights in issue here are not permissible since they are not on a class basis.

*Id.* at 847. The *Baker* court thus rejected the idea that a charter provision could use a formula or procedure to specify the number of votes that each share of a class would carry in which the inputs could result in different shares of the same class carrying different numbers of votes.

---

[9] Scaled voting mechanisms were prevalent at the time. *See generally* Sara C. Haan, *Voting Rights in Corporate Governance: History and Political Economy* at 29–34 (Dec. 11, 2022) (discussing prevalence of scaled or graduated voting schemes and their use as devices to constrain the power of large holders), S. Cal. L. Rev. (forthcoming), available at https://ssrn.com/abstract=4299462 (last visited September 9, 2023).

Today, Section 151(a) expressly permits the use of formulas and procedures that apply across all shares but which can generate different results for different shares based on facts ascertainable outside of the charter (such as the identity of the holder). In 1977, Section 151(a) did not yet contain "facts ascertainable" language. That concept first appeared in the DGCL in 1974 when the long-form merger statute was amended so that "the terms of the merger including the exchange ratio may be made dependent upon facts ascertainable outside of the merger agreement, so long that it is made clear in the agreement . . . the precise way that these facts will affect the exchange ratio or other terms of the merger."[10] In 1983, the General Assembly added parallel "facts ascertainable" language to Section 151(a).[11] Today, the facts ascertainable concept can be deployed generally, subject to limited exceptions. *See* 8 *Del. C.* § 102(d).

In 1977, however, Section 151(a) provided as follows:

Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value and which classes or series may

---

[10] General Corporation Law Committee of the Delaware State Bar Association, Commentary on Legislative Proposals for the 127th General Assembly, Second Session, 1974, § 12 at 4, quoted in 2 Edward P. Welch, Robert S. Saunders & Jennifer C. Voss, *Folk on the Delaware General Corporation Law* § 251.07 n. 188 (6th ed.); *see* 59 Del. Laws ch. 437, § 12 (1974).

[11] 64 Del. Laws, c. 112, § 8 (1983), quoted in 2 Welch, supra, § 151.09 ("Section 151(a) was amended to provide that 'voting powers, designations, preferences, rights and qualifications, limitations or restrictions' of any stock could be made dependent on facts ascertainable outside the certificate of incorporation or outside a resolution adopted by the board of directors as long as the certificate of incorporation or the board resolution makes clear 'the precise way that these facts will operate on the class or series of stock so issued.'").

have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation. The power to increase or decrease or otherwise adjust the capital stock as provided in this chapter shall apply to all or any such classes of stock.

8 *Del. C.* § 151(a) (1977), *quoted in Providence*, 378 A.2d at 121 n.1. But even with the statute as written in 1977, the Delaware Supreme Court could have taken on the Court of Chancery's holding directly and interpreted Section 151(a) to authorize the scaled voting mechanism. The Delaware Supreme Court needed only to explain that what must be identical across all shares in the class is not the outcome, but the method.

That is not what happened. In what seems like an effort to outflank the Court of Chancery's ruling, the corporation argued that Section 151(a) did not speak to the validity or invalidity of the scaled voting right. According to the corporation, that left the field open and enabled the corporation to rely on Section 102(b)(1), which authorizes the charter to contain,

any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State.

8 *Del. C.* § 102(b)(1). The corporation claimed that Section 102(b)(1) validated the scaled voting structure.

20

The Delaware Supreme Court initially followed the corporation's lead by stating that Section 151(a) did not answer the question presented. *Providence*, 378 A.2d at 122 ("We cannot agree that the answer to the problem presented is manifest and explicit on the face of § 151(a). The language of § 151(a), standing alone, neither permits nor prohibits the type of voting restrictions here challenged, either explicitly or by necessary implication."). But the high court did not look next to Section 102(b)(1), as the corporation urged. Instead, the justices looked "primarily" to Section 212(a), albeit with a dash of Section 151(a) thrown in. *See id.* at 123 ("For present purposes, § 151(a) must be read in conjunction with § 212(a). In our view, one must look primarily to § 212(a), and not to § 151(a), for the validity of the P & W voting restrictions.").

Relying primarily on Section 212(a) was a strange move, because that section does not authorize or restrict anything. Section 212(a) creates a default right of one vote per share, and it provides that if a charter departs from the default right, then any voting calculations required by the DGCL—such as the amount of voting power that would constitute a majority of the voting power outstanding—must use the voting power as determined by the charter.

Having cited Section 212(a) as the provision to which "one must look primarily," the *Providence* decision offered the following observation:

> In the final analysis, these restrictions are limitations upon the voting rights of the stockholder, not variations in the voting powers of the stock per se. The voting power of the stock in the hands of a large stockholder is not differentiated from all others in its class; it is the personal right of the stockholder to exercise that power that is altered by the size of his holding. In the hands of smaller stockholders, unrestrained in the exercise of their

21

voting rights, the same stock would have voting power equal to all others in the class . . . .

> We are of the opinion that, in the absence of any express provision in § 151(a), or elsewhere in the Law, prohibiting the [company's] charter restrictions on voting, the provisions of § 212(a) control in determining the validity of those restrictions. Under § 212(a), voting rights of stockholders may be varied from the "one share-one vote" standard by the certificate of incorporation, subject only "to the provisions of § 213" of the Corporation Law. It is significant, we think, that § 212(a) was not made expressly subject to the provisions of § 151(a) in a similar manner. The absence in § 212(a) of such similar cross reference to § 151(a) is, in our judgment, indicative of the absence of any legislative intent to prohibit, by § 151(a), charter restrictions upon stockholders' voting rights such as are under challenge here.

*Id.* (footnote omitted).

That language is difficult to parse. One confusing aspect is the framing of the scaled voting provision as imposing "voting restrictions." The *Providence* court appears to have viewed the charter provision as a restriction that prevented an owner from exercising the full voting power that the shares otherwise carried, rather than as a provision that established the voting power carried by shares. Under this reading, each share continued to carry one vote per share, with the scaled voting provision preventing the owner from exercising some of the votes that the share carried. That understanding creates knock-on problems that the *Providence* decision did not acknowledge. For example, if the scaled voting provision operated in that fashion, then the denominator for a vote of the outstanding stock would be calculated based on one vote per share, but the votes in the numerator would be cut back by ownership level, making it difficult to achieve the necessary majority. That does not seem intended. The provision instead appears to establish the voting power

appurtenant to the shares, at which point Section 212(a) generates an adjusted lower number for both the numerator and the denominator.

Another confusing aspect is the emphasis the justices placed on statutory language making Section 212(a) subject to the language of Section 213(a), but without any similar reference to Section 151(a). The *Providence* court stated that "[t]he absence in § 212(a) of such similar cross reference to § 151(a) is, in our judgment, indicative of the absence of any legislative intent to prohibit, by § 151(a), charter restrictions upon stockholders' voting rights such as are under challenge here." *Id.* Section 213 is the provision in the DGCL which authorizes a corporation to establish a record date for determining which holders can exercise the voting power appurtenant to the corporation's shares in connection with a particular vote. *See* 8 *Del. C.* 213(a). Section 213 deals with the practical problem of determining which owner gets to exercise the voting rights appurtenant to the shares, not the calculation of the voting power carried by the shares. Section 213 ensures that if new owner acquires shares after the record date, then the power to exercise the voting rights appurtenant to the shares formally remains with the holder on the record date.[12] Section 212(a) makes the exercise of voting rights "subject to § 213" to make clear that it does not override that practical solution. 8 *Del. C.* § 212(a). There was no need to make Section 212(a) subject to Section 151(a), because Section 212(a) already states that the default rule

---

[12] In equity, a subsequent holder can compel the record-date holder (assuming that person can be identified) to issue a proxy to vote the shares as of the record date. *Commonwealth Assocs. v. Providence Health Care, Inc.*, 641 A.2d 155, 158 (Del. Ch. 1993) (Allen, C.); *In re Giant Portland Cement Co.*, 21 A.2d 697, 701 (Del. Ch. 1941).

23

of one vote per share applies "[u]nless otherwise provided in the certificate of incorporation." *Id.* Section 151(a) is one of the DGCL provisions which determines the extent to which a corporation can "otherwise provide[]" in its certificate of incorporation. *Id.* The *Providence* court correctly held that nothing in Section 151(a) suggests an intent to prohibit a scaled voting structure, but that is a function of Section 151(a), not the absence of a reference to Section 151(a) in Section 212(a). Under the *Providence* court's reasoning, Section 212(a) is not subject to Section 151(a), which cuts Section 151(a) out of the analysis for purposes of voting rights. No matter what Section 151(a) said, a corporation would be free to rely on Section 212(a) to "otherwise provide[] in the certificate of incorporation." *Id.* That is not a coherent reading of the two sections.

The biggest puzzle is the distinction that the *Providence* court drew between permissible "limitations upon the voting rights of the stockholder" and impermissible "variations in the voting powers of the stock *per se*." 378 A.2d at 123. Elaborating on this distinction, the high court asserted that the scaled voting mechanism was permissible because "[t]he voting power of the stock in the hands of a large stockholder is not differentiated from all others in its class," and "[i]n the hands of smaller stockholders, unrestrained in the exercise of their voting rights, the same stock would have voting power equal to all others in the class." *Id.* Rather than any "variations of the voting powers of the stock per se," the scaled voting provision was acceptable because it restricted "the personal right of the stockholder to exercise that [voting] power" based on "the size of his holding." *Id.*

24

The distinction between "voting rights of the stockholder" and "voting powers of the stock" is problematic when the pertinent provision appears in the charter. Under Section 102(a)(4) and 151(a), such a provision determines the voting power carried by the shares. What the provision generates is *both* "the voting powers of the stock" *and* "the voting rights of the stockholder." There is no daylight between the two.[13]

A related problem is that because the distinction is a false one, it is unstable. The *Providence* charter provision framed the scaled voting mechanism in terms of the number of shares that the stockholder could vote. The *Providence* opinion did not reproduce the provision, but the longer *Baker* opinion did:

> NINTH: Meetings of the stockholders may be held at such city, town or village within or without the State of Delaware as may be named in the By-Laws. The annual meeting shall be held at such time as required by the By-Laws; and at all meetings stockholders, holding or representing by proxy not less than twenty-five hundred shares, shall be necessary to constitute a quorum of the corporation, *and each stockholder shall be entitled to one vote*

---

[13] A difference could exist between "the voting rights of the stock" and "the voting rights of the stockholder" if a holder agreed in a stockholders agreement not to exercise a portion of the voting rights otherwise carried by the shares. Envision a stockholder that owns one million shares, each carrying one vote per share. A stockholder could agree in a stockholders agreement not to exercise 900,000 of its votes. Under that arrangement, the voting power carried by the shares would still be one vote per share for a total of one million votes, but the voting power that the stockholder could exercise by contract would be 100,000 votes. As discussed above the line, this combination could generate odd results, because the outstanding voting power carried by the corporation's shares would be based on the one million votes appurtenant to the shares, regardless of the stockholder's decision to bind itself not to exercise 900,000 of those votes. A similar problem would exist for an issue that would be decided by a majority of the voting power present and entitled to vote at a meeting at which a quorum exists. *See* 8 *Del. C.* § 216. The shares would be legally entitled to vote on the issue presented, even though the stockholder would not be allowed to vote as a matter of contract. Those distinctions do not make sense for a charter provision that establishes the voting power that a share carries for purposes of a vote.

> *for every share of the common stock of said company owned by him not exceeding fifty shares, and one vote for every twenty shares more than fifty, owned by him; provided, that no stockholder shall be entitled to vote upon more than one fourth part of the whole number of shares issued and outstanding of the common stock of said company, unless as proxy for other members.*

*Baker*, 364 A.2d at 840 (emphasis added). Perhaps the provision's use of the phrase "each stockholder shall be entitled to vote" resulted in the Delaware Supreme Court's reference to "the voting rights of the stockholder." But Section 212(a) uses the same framing interchangeably with the voting power of each share, so that language should not have mattered.

Demonstrating that the distinction lacks substance, the same scaled voting mechanism can be framed in terms of the number of votes carried by the shares. The operative language might state:

> Each share shall carry one vote per share; *provided, however*, that if the owner of a share owns more than 50 shares, then that share shall carry a fraction of a vote equal to the sum of (i) the quotient of (a) 50 divided the number of shares held by the owner plus (ii) the quotient of (a) the number of shares held by the owner minus fifty divided by (ii) twenty; *and provided, however*, that if the owner of the share owns more than 25% of the outstanding stock, then that share shall carry a fraction of a vote equal to the quotient of (i) the number of outstanding shares times 25% divided by (ii) the number of shares held by the owner.

To be sure, the formula-based version is more math-y and less intuitive, so it is understandable why a drafter would prefer to follow Section 212(a) and frame the provision in terms of the votes that a stockholder can exercise. The result, however, is identical. Each share carries a level of voting power that varies based on the number of shares that the

same owner holds. The distinction that the *Providence* court drew is therefore an easily evaded formalism. In substance, it is no distinction at all.

Yet another problem with the *Providence* distinction is that it conflicts with a strain of Delaware law that makes clear that the rights appurtenant to a share, whether they are default rights or special attributes, are property rights carried by the share. The holder can exercise those rights *qua* holder, but they are not personal rights of the holder. *Urdan*, 244 A.3d at 677. As such, both the rights and any claim that they were violated transfers to the new owner when the share is sold. *See id.*; 6 *Del. C.* § 8-302(a). For purposes of Delaware law, the right to vote does not belong to the owner of the shares; it is a property right appurtenant to the shares. The claim that the right to vote was violated is not an injury personally to the holder of the shares; it is an injury to the rights appurtenant to the shares.[14] The *Providence* decision analyzed the voting scheme at issue as if they were personal rights of the holder, rather than rights appurtenant to the shares, but that is not how Delaware law treats voting rights. Delaware law correctly views the rights as appurtenant to the shares, any injury as having been suffered by the shares, and any claim as traveling with the shares. *See Urdan*, 244 A.3d at 677–68.

---

[14] *In re AMC Ent. Hldgs., Inc. S'holder Litig.*, 2023 WL 4677722, at *21 (Del. Ch. July 21, 2023); *see also Urdan*, 24 A.3d at 677 ("A corporate charter violation claim travels with a stock sale because the injury is to the stock and not to the holder."); *see generally In re Activision Blizzard, Inc. S'holder Litig.*, 24 A.2d 1025, 1043–57 (Del. Ch. 2015) (collecting authorities and discussing differences between derivative, direct, and personal claims).

27

Despite these problems, the plaintiff embraces the distinction that the *Providence* court drew and argues that it renders the Challenged Provisions invalid. But comparing the language of the scaled voting right in *Providence* with the language of the Challenged Provisions demonstrates that there is no meaningful linguistic distinction between the provisions that such that one would be a permissible "limitation on the voting rights of the stockholder" and the other an impermissible variation "in the voting rights of the stock per se." The scaled voting right in *Providence* stated that "each stockholder shall be entitled to" a particular number of votes. The Class A Voting Right states that "[e]ach holder of record of Class A Common Stock, as such, shall be entitled to" a particular number of votes. The Class B Voting Right states that "[e]ach holder of record of Class B Common Stock, as such, shall be entitled, without regard to the number of shares of Class B Common Stock (or fraction thereof) held by such holder," to a particular number of votes. If the *Providence* provision permissibly addressed the voting rights of the stockholders as opposed to the shares, then so do the Challenged Provisions. The distinction is a false one, but to the extent it exists, the Challenged Provisions fall on the valid side of the line.

Another potential distinction between the scaled voting right and the Challenged Provisions might be that the former reduced voting power below the one-vote-per-share default right while the latter increased voting power beyond that default right. The underlying legal question is whether a charter provision can modify voting rights based on the identity of the holder. For purposes of that question, it does not matter whether the votes go up or down. Not only that, but the subsequent *Williams* decision treated a provision that increased voting power as no different than the scaled voting provision that

28

decreased voting power. In *Williams*, this court approved a tenured-voting provision that gave *more* votes to stockholders who had held their shares since before the recapitalization or for three years since purchase. 1987 WL 11285, at *1. The *Williams* court held that the increase was valid under *Providence.* The same should be true for the Challenged Provisions, which increase the voting power of shares when they are held by Principal Holders.[15]

While it is possible fit the Challenged Provisions into the *Providence* framework and uphold them on that basis, the better path is to acknowledge that for purposes of a charter provision that establishes the voting power appurtenant to shares, there is no meaningful distinction between "the voting rights of the stockholder" and "the voting powers of the stock." The *Providence* decision reached the right result. We should not dissect its entrails to divine a prediction for future cases that does not make any sense.

The Challenged Provisions do not violate Section 212(a).

---

[15] Further illustrating the incoherence of the distinction between the voting powers carried by the shares and the voting powers exercised by the stockholder, the *Williams* court held that the certificate "does not provide differing voting rights for the stock, *per se*," *id.* at *4, but rather altered "the personal right of the stockholder to exercise that power," *id.* (quoting *Providence*, 378 A.2d at 123). In *Providence*, the idea of a restriction at least opened the door to a conceivable distinction between share-based voting power and its stockholder-level exercise. In *Williams*, unless the stock received the additional voting power, where did the votes come from so that the holder could exercise them personally? Viewing the votes as existing at the level of the owner would mean that they were not tied to the shares. Do they just appear in the record-date holder's pocket? Sections 102(a)(4) and 151(a) require that the charter specify the voting rights appurtenant to the shares, meaning that any provision which does so necessarily provides voting rights for the stock *per se*. Under Section 151(a), that's fine.

## C. The Section 151(a) Argument

The plaintiff's other argument contends that the Challenged Provisions violate Section 151(a) of the DGCL based on an argument that the *Baker* court accepted in the trial-level decision but that the Delaware Supreme Court reversed in *Providence.* Under the most extreme version of that theory, embraced in *Baker*, a class of stock must assign the same voting rights to all shares. A class of stock can use a formula, but the formula must generate the same result for all shares. Under a less extreme version of that theory, a charter can deploy a formula that can generate different results for different shares, but it must be a formula that gives any holder an opportunity to gain the benefits of the superior voting rights. The provision cannot create a closed set of owners entitled to the superior voting rights. Neither version presents a valid challenge under Section 151(a).

The plaintiff's starting point is correct: A charter must provide for rights, powers, preferences, limitations, and qualifications that are identical across a class of stock. That requirement flows from Section 151(a) itself, which speaks of creating "1 or more classes of stock," and then authorizes the charter to specify the attributes of the class of shares. Put differently, the words that frame the attributes of the class, whether by incorporating default rights from the DGCL, making those default rights express, or creating special attributes, must apply equally to all shares within the class.

The plaintiff then argues that if a formula does not create the same outcome for each share in the class, then the provision creates *de facto* subclasses in violation of Section 151(a). That does not follow, and Delaware decisions have rejected that argument. The Delaware Supreme Court's decision in *Providence*, plus this court's decisions in *Williams*

30

and *Sagusa*, each upheld formulas that applied identically across all shares but generated different outcomes for particular shares.[16] The same could be true for any other special attribute. For example, a charter provision might state that a series of preferred stock would earn cumulative dividends of 15% per share on the amount paid for the share starting one year after the date of issuance. If the corporation issued all of the shares of preferred stock on the same date and for the same price, then the formula would generate the same liquidation preference for each share. But if the corporation issued shares over time and at different prices, then the formula would generate different liquidation preferences. There is nothing wrong with that; it is an efficient way to raise capital without having to create a new class of shares each time the issuance price chances. Or a provision in a certificate of designations might state that if an acquirer purchases more than 15% of the corporation's common stock, then each share would carry the right to convert into shares worth $100 in return for a payment to the corporation of $50, but that shares held by the acquirer would not carry that right. There is nothing wrong with that either; it makes poison pills work.

---

[16] In *Sagusa*, the per-capita voting right might seem to generate the same outcome—one vote per stockholder. But what the per-capita voting right actually does is to vary the voting power associated with the shares such that the holder of those shares can only exercise one vote. Using mathematical language, a charter provision might accomplish that by saying: Each share of stock shall carry a number of votes equal to the quotient of (i) one divided by (ii) the total number of shares of stock held by the holder of the share. As with the mathematical version of the scaled voting provision, it is much easier to speak in terms of the stockholder by writing something like: "Each stockholder shall have one vote regardless of how many shares owned." But regardless of how it is framed, the provision changes the voting power carried by the shares, as required by Section 151(a).

For purposes of its legal validity, a voting right that varies based on the identity of the holder is no different.

That leads to the plaintiff's alternative argument, which is that the formula must give any holder an equal opportunity to gain the superior right. The plaintiff says that the tenured voting provision in *Williams* was acceptable because any stockholder could own their shares for three years, thereby gaining ten votes per share. The scaled voting provision in *Providence* was acceptable because any stockholder who owns a particular number of shares is affected by the scale in the same way. And the per capita voting structure in *Sagusa* worked because it applied across the board.

What is not permissible, according to the plaintiff, is to create a closed set of beneficiaries. A charter provision thus could not say that each share of common stock carries one vote per share, unless held by Amy, Bob, and Charlotte, in which case each share carries ten votes per share. Under the plaintiff's logic, that structure creates two closed sets of owners. One set is Amy, Bob, and Charlotte; the other set is everyone else. According to the plaintiff, that is not a single class of stock with voting rights that vary based on a fact ascertainable outside the certificate of incorporation, but rather two classes of stock masquerading as one. The plaintiff views the Challenged Provisions as a slightly more subtle version of the Amy, Bob, and Charlotte provision, because they grant high-voting rights to the Principal Stockholders, defined as the parties to the stockholders agreement. Worse, says the plaintiff, the Company can manipulate who is a Principal Stockholder by adding or subtracting individuals as parties to the stockholders agreement. The Challenged Provisions thus create a closed set that only the insiders can open. Other

32

stockholders are forever relegated to second-class status unless the insiders deign to admit them.

The plaintiff's framing intentionally appeals to American cultural ideals like equality of opportunity and resistance to entrenched hierarchies. The plaintiff views identity-based voting as an entrenched hierarchy. The plaintiff wants all stockholders to have equality of opportunity.

In many areas of the law, those noble sentiments could carry weight. They cannot overcome the plain language of the DGCL. Nothing in Section 151(a) prohibits a provision that creates a closed set of holders who can exercise certain rights. As a matter of statute, the Amy, Bob, and Charlotte provision would be valid. The fact that the Challenged Provisions add flexibility by linking the identity of the Principal Stockholders to the parties to the stockholders agreement may frustrate the plaintiff, but it falls within the authority to make special attributes dependent on facts ascertainable outside of the certificate of incorporation. In fact, because an ascertainable fact can be "a determination or action by any person or body, including the corporation," the voting power carried by shares could be made dependent on such a determination.

The Challenged Provisions do not violate Section 151(a).

## III. CONCLUSION

The Challenged Provisions comply with Delaware law. Corporate action under Delaware law is always twice tested, once for legal compliance and again in equity.[17] The plaintiff in this case mounted the first type of challenge and tested the legal validity of the Challenged Provisions. This decision provides no opportunity to express any view on situations in which a governance structure that used identity-based voting could be inequitable.

The defendants' motion for summary judgment is granted. The plaintiff's motion for summary judgment is denied. The parties will confer regarding any steps that are necessary to bring this matter to a close. If there are none, then the parties will submit a form of final order. Otherwise, the parties will submit a joint letter addressing those matters and proposing a schedule for resolving them.

---

[17] *Backer v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 97 (Del. 2021). *Cf. Bodell v. Gen. Gas & Elec. Corp.,* 132 A. 442, 447 (Del. Ch. 1926) (Wolcott, Jos., C.) (applying twice testing principle without using that language: "Notwithstanding therefore the absolute terms in which the power of the directors of this corporation to fix the price at which its unissued stock may be sold is expressed, equity will nevertheless by an analogy to that reasoning which underlies the doctrine of preemptive right interfere to protect existing stockholders from an unjustified impairment of the values underlying their present holdings"), *aff'd*, 140 A. 264 (Del. 1927).